906 A.2d 1028

**Edward VEYTSMAN, et al.**

v.

**NEW YORK PALACE, INC.**

**No. 2545, Sept. Term, 2004.**

Court of Special Appeals of Maryland.

Sept. 8, 2006.

Michael B. Green, Towson, for appellant.

Jennifer L. Kleeman (Charles Dillon, Andrew M. Battista, on the brief), Towson, for appellee.

Panel: HOLLANDER, ADKINS and BARBERA, JJ.

ADKINS, J.

In this appeal, we consider Maryland tort law concerning the duty of a restaurant or tavern owner to patrons who were assaulted on the business premises by other patrons. After they were assaulted by fellow guests inside the New York Palace restaurant, Edward and Tatyana Veytsman filed suit

against the restaurant in the Circuit Court for Baltimore City. At the end of a three-day jury trial, the circuit court granted the restaurant's motion for judgment as a matter of law, ruling that the Veytsmans failed to present sufficient evidence that the New York Palace owed a duty to protect them against the assault or to prevent it. The Veytsmans argue on appeal that this decision was erroneous. We agree with the trial court and will therefore affirm.

## FACTS AND JUDICIAL PROCEEDINGS

### Background

The New York Palace is a restaurant in the Bolton Hill neighborhood of Baltimore City.[1] The restaurant "caters in large part to the Russian population of Baltimore and surrounding areas." It has a capacity of 363 people and is also a hosting facility for parties and receptions.

On Sunday, August 12, 2001, the New York Palace hosted a wedding reception. The newlyweds knew the owners of the restaurant well, and had been to the restaurant many times before. There were between 40 and 60 guests at the reception. The guests arrived between 5:00 and 6:00 p.m., and were seated by 6:00 p.m. A significant amount of alcohol was consumed during the wedding reception, which lasted until sometime between 1:00 a.m. and 2:00 a.m. In addition to the vodka, wine, and cognac provided by the restaurant, Vyacheslav Drakh, the manager, observed that guests had brought their own Ukranian vodka into the restaurant. The guests had been drinking "since the time they got in, since the beginning of the party," and were therefore "drunk."

Alexi Litovka, a waiter for the wedding party, was "really scared of that wedding" because "there were lots of extremely big men" in attendance "and you can expect like anything to

---

1. Because the trial court granted New York Palace's motion for judgment, our recitation of the facts will be in the light most favorable to the Veytsmans. *See Echard v. Kraft,* 159 Md.App. 110, 114, 858 A.2d 1018 (2004)(setting forth evidence on appeal in light most favorable to non-moving party).

happen from that." Litovka "wouldn't say that [the men] were doing anything bad, and "didn't see them doing any fighting[.]" "But it wasn't like . . . other wedding parties where everything was more civilized[.]" According to Drakh, there were "no security problems or behavioral issues with the wedding party" during the reception. A co-owner, Lev Nemirovsky, likewise believed that the "behavior" at the wedding was "[t]he same as the other hundred."

## The Assault

After the wedding reception was well underway, around 11:30 p.m., Edward and Tatyana Veytsman arrived at the New York Palace to have dinner with their friends, Leonid and Svetlana Barmak. The Veytsmans had been personally invited to the restaurant by Drakh, who called them at home that evening to extend the invitation. Other than the wedding reception and the Veytsman–Barmak party, which was seated in a different part of the restaurant, there were only a handful of other guests.

At some point between 1:00 and 2:00 a.m., the reception came to a close, and the guests began to board a charter bus parked outside of the restaurant. Around the same time, the Veytsmans and Barmaks prepared to leave. First, Mrs. Barmak used the restroom. While inside, Mrs. Barmak made "a comment about the mess in the bathroom," stating that she could "hardly use the bathroom because it's messy." [2] One of the wedding reception guests reported to Sam Levin, a co-owner of the New York Palace, that Mrs. Barmak was in the restroom, hitting the sister of the bride with a shoe. Levin went to the bathroom, where he saw Mrs. Barmak holding a shoe and fighting with the bride's sister. He believed that Mrs. Barmak was "totally drunk." Mr. Veytsman and Mr. Barmak met Levin at the restroom, where Levin watched Mrs. Barmak "ask[ ] her husband, 'Why you not a man? You

---

2. The guests of the traditional Ukranian wedding reception had utilized the women's bathroom as a dressing area to don various traditional Ukranian garments for dances at the reception.

are supposed to fight for me.'" According to Levin, "Mr. Barmak and Mr. Veytsman did not want to fight," and they "assure[d]" him that they would calm Mrs. Barmak down. "Tatyana [Veytsman] and her husband personally sa[id] don't worry, Sam, everything is fine." After "everything [was] calmed down and everybody [was] calmed down," Levin went back to his office.

Mrs. Barmak returned to the bathroom with Mrs. Veytsman. When the two women entered the restroom, "suddenly this one woman runs in and starts to scream at Mrs. Barmak saying[,] . . . [']did you say that my wedding stink up the bathroom[?']" Mrs. Barmak and the other women began to argue and physically fight again.[3] Mrs. Veytsman tried to end the fight, but, finding herself unsuccessful, started to leave the bathroom to get help. She opened the bathroom door, but was immediately hit in the face by a man. A woman then jumped on top of Mrs. Veytsman and was "hitting her hardly" "trying to just, you know, knock [her] face over the floor." From his table across the room, Mr. Veytsman heard his wife cry out, and got up to go to her aid. When he reached the lobby, a person hit him in the eye. He fell to the ground, where he was kicked repeatedly in the head. Although Mrs. Veytsman did not suffer permanent injuries, Mr. Veytsman was hospitalized for several days, and ultimately one of his eyes had to be surgically removed.

Immediately before the assault, the only members of the wedding party remaining in the restaurant were the bride, the bride's sister, and their mother. Nemirovsky, another owner,

---

3. Under the Barmaks' and Veytsmans' version of the events, there was only one scuffle in the bathroom. Levin, however, testified to two: the first, which involved only Mrs. Barmak and which he calmed down, and the second, involving Mrs. Veytsman also. Because proof of a prior incident is evidence supporting the Veytsmans' claim that the restaurant had a duty to protect them, we include it here, as we must review the evidence in the light most favorable to the Veytsmans. See *James v. Gen. Motors Corp.*, 74 Md.App. 479, 484–85, 538 A.2d 782, *cert. denied*, 313 Md. 7, 542 A.2d 844 (1988)(appellate review of grant of motion for judgment requires us to apply the same standard as the trial court).

had already escorted all of the other guests outside to the charter bus. While he was standing outside near the restaurant door talking to the bride's father, Nemirovsky watched six to ten people get off the bus. He opened the door for these people to go back inside the restaurant. He did not know why they wanted to go back inside the restaurant, as he was involved talking to the bride's father. After a few seconds, he followed the men inside the restaurant, where he watched them talking very loudly and angrily. "Several seconds" after that, he then saw that "everybody started to fight." "It took ten or fifteen seconds."

Drakh similarly observed that the men who reentered the restaurant—he would estimate there were fifteen—were "screaming" and "started extremely rudely to speak to Mr. Barmak and Mr. Veytsman." He believed that the men returned to the restaurant because they "were ready for a fight. They came to have a fight because the women were insulted." He indicated that "Mr. Barmak and Mr. Veytsman said that they don't know, that they don't understand what [the men] are talking about" and that "neither Barmak nor Veytsman wanted to have this fight."

### Prior Incidents And Security

When the New York Palace first opened, the crowds were larger and came from "all over." To maintain order, the restaurant frequently employed security, consisting of one or two people, typically stationed at the bar. The restaurant, however, eventually stopped employing security on a regular basis because business had slowed down. It would only hire security on particular occasions "if there would be many young people" or "if there were any particular events" requiring security. The restaurant would **not** hire security if it was hosting a private party of guests who knew one another, such as a wedding reception of only 40 or 50 people. There was no testimony of any prior violence occurring inside the restaurant.

The issue of prior fights **outside** of the restaurant did come up at trial. The only specific incident discussed was one in

which a customer hit his own wife in the parking lot.[4] When a security guard employed by the New York Palace tried to stop the man, the man "wielded a bottle" at the guard, prompting the guard to hit the man.

## The Court's Ruling

After the Veytsmans' case-in-chief, the trial court denied the New York Palace's motion for judgment as a matter of law, indicating that it was "concerned about" "a re-entry of what everybody knew was trouble." At the end of the trial, however, the court changed its mind and concluded that the Veytsmans had failed to present sufficient evidence to support their claim:

> The hesitation that the court had [ ] yesterday was based on a very slim reed, and that is, is that the testimony of this one witness that these people came back in looking for a fight. I think defense counsel correctly pointed out that that testimony was very vague was to, first of all, what it is that meant . . .
>
> So that really doesn't say very much in terms of creating a duty. And that's really what it is, is whether or not there was a duty. The testimony offered by the defense, the court does not believe created a duty.

---

**4.** Alexi Litovka testified that he "knew that there were fights outside the restaurant sometimes in the parking lot," but admitted that his knowledge came from "rumors" or "common knowledge." He stated that he never saw any fights with his own eyes, nor did he know who was involved in the fights. Defense counsel, objecting to Litovka's testimony, proffered that the New York Palace shares its parking lot with a high rise apartment building, as well as other commercial properties.

 Although it originally permitted Litovka to testify about the "rumors," the court later reconsidered and ruled that Litovka's testimony must be stricken from the record, presumably on the grounds that it was not based on personal knowledge and/or was inadmissible hearsay. The Veytsmans do not dispute this ruling on appeal.

 There was also testimony that one of the restaurant's waiters had been hit in the parking lot, but the court struck this testimony from the record after it was adduced that this incident occurred **after** the night of the Veytsmans' assault. The Veytsmans likewise do not contest this ruling.

## Question Presented

On appeal, the Veytsmans ask us to answer only the following question:

Did the lower court err in granting [the] motion for judgment at the end of the entire case and finding that [the New York Palace] had no duty to the [Veytsmans] to protect [them] from the attacks of third party individuals who were also guests of the restaurant[?]

For reasons articulated below, we answer "no."

## DISCUSSION

### I.

### Standard Of Review

Maryland Rule 2–519(a) provides that "[a] party may move for judgment on any or all of the issues in any action at the close of the evidence offered by an opposing party, and in a jury trial at the close of the evidence." Part (b) of the Rule directs the court, in ruling on such a motion in a jury trial, to "consider all evidence and inferences in the light most favorable to the party against whom the motion is made." After doing so,

[i]f there is any evidence, no matter how slight, legally sufficient to generate a jury question, the motion must be denied. On the other hand, where the evidence is not such as to generate a jury question, i.e., permits but one conclusion, the question is one of law and the motion must be granted.

*James v. Gen. Motors Corp.*, 74 Md.App. 479, 484, 538 A.2d 782, *cert. denied*, 313 Md. 7, 542 A.2d 844 (1988) (citations omitted). Our review of the grant of the New York Palace's motion requires us to draw the same inferences and undertake the same analysis as the trial court.[5] *See id.* at 484–85, 538 A.2d 782.

---

**5.** The Veytsmans contend that the trial court improperly "decided the importance of the evidence and the weight it was to be given[.]"

## II.

### Principles Of Legal Duty

The Court of Appeals has outlined "[a] properly pleaded claim of negligence" as follows:

The plaintiff must allege (1) that the defendant was under a duty to protect the plaintiff from injury, (2) that the defendant breached that duty, (3) that the plaintiff suffered actual injury or loss, and (4) that the loss or injury proximately resulted from the defendant's breach of the duty. **Although, generally, whether the plaintiff has presented adequate proof of these elements is a question for the fact finder, the existence of a legal duty ordinarily is a question of law to be decided by the court.**

*Todd v. Mass Transit Admin.*, 373 Md. 149, 155, 816 A.2d 930 (2003)(quotation marks and citations omitted; emphasis added).

" '[D]uty' in a negligence claim" has been defined "as an obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward another." *Id.* (quotation marks and citation omitted). "There is no set formula for this determination[,]" but rather, it "is only an expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection." *Ashburn v. Anne Arundel County*, 306 Md. 617, 627, 510 A.2d 1078 (1986) (quoting *Prosser and Keeton on Torts* § 53 (5th ed.1984)). "[T]here are," however, "a number of variables to be considered in determining if a duty exists:"

[T]he foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered the injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of

---

Because we must conduct an independent determination of whether the evidence was legally sufficient to generate a jury question, the trial court's consideration of the evidence is irrelevant on appeal.

the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost and prevalence of insurance for the risk involved.

*Id.* (citation omitted).

The Court has explained that, "[w]hile foreseeability is often considered among the most important of these factors, its existence alone does not suffice to establish a duty under Maryland law." *Remsburg v. Montgomery,* 376 Md. 568, 583, 831 A.2d 18 (2003). "This principle is apparent in the . . . general rule that there is no duty to control a third person's conduct so as to prevent personal harm to another, unless a 'special relationship' exists either between the actor and the third person or between the actor and the person injured." *Ashburn,* 306 Md. at 628, 510 A.2d 1078. *See also Restatement (Second) of Torts* § 315 (1965)(hereinafter cited as "*Restatement*").

■ A "special relationship" can be established in several ways, including "(1) by statute or rule; (2) by contractual or other private relationship; or (3) indirectly or impliedly by virtue of the relationship between the tortfeasor and a third party." *Bobo v. State,* 346 Md. 706, 715, 697 A.2d 1371 (1997) (citations omitted). Maryland has adopted as common law the *Restatement* doctrine regarding special relationships. *See Remsburg,* 376 Md. at 593, 831 A.2d 18.

Section 314A of the *Restatement,* which is titled "Special Relations Giving Rise To Duty To Aid Or Protect," states that "[a] possessor of land who holds it open to the public is under a . . . duty to members of the public who enter in response to his invitation" to "take reasonable action . . . to protect them against unreasonable risk of physical harm." [6] *Restatement*

---

6. The entirety of *Restatement* section 314A states:

(1) A common carrier is under a duty to its passengers to take reasonable action

 (a) to protect them against unreasonable risk of physical harm, and

§ 314A(3). The Court of Appeals has explained that its intent in adopting section 314A was to protect invitees of business establishments:

[I]n particular [we] embrace the proposition that an employee of a business has a legal duty to take affirmative action for the aid or protection of a business invitee who is in danger while on the business's premises, provided that the employee has knowledge of the injured invitee and the employee is not in the path of danger.

*Southland Corp. v. Griffith*, 332 Md. 704, 719, 633 A.2d 84 (1993).

■ We have cautioned that "[t]he term 'special relation,' as used by the *Restatement*, and relevant case law, means simply a relationship that gives rise to a duty to exercise reasonable care." *Corinaldi v. Columbia Courtyard, Inc.*, 162 Md.App. 207, 220, 873 A.2d 483, *cert. dismissed*, 389 Md. 124, 883 A.2d 914 (2005). In the context of a business owner, this duty generally arises when "three circumstances" are present: [7]

_____

(b) to give them first aid after it knows or has reason to know that they are ill or injured, and to care for them until they can be cared for by others.

(2) An innkeeper is under a similar duty to his guests.

(3) A possessor of land who holds it open to the public is under a similar duty to members of the public who enter in response to his invitation.

(4) One who is required by law to take or who voluntarily takes the custody of another under circumstances such as to deprive the other of his normal opportunities for protection is under a similar duty to the other.

**7.** Additionally, *Restatement* § 344 (1965) states:

A possessor of land who holds it open to the public for entry for his business purposes is subject to liability to members of the public while they are upon the land for such a purpose, for physical harm caused by the accidental, negligent, or intentionally harmful acts of third persons or animals, and by the failure of the possessor to exercise reasonable care to

(a) discover that such acts are being done or are likely to be done, or

(b) give a warning adequate to enable the visitors to avoid the harm, or otherwise to protect them against it.

(1) the [owner] controlled the dangerous or defective condition; (2) the [owner] had knowledge or should have had knowledge of the injury causing condition; and (3) the harm suffered was a foreseeable result of that condition. *Hemmings v. Pelham Wood Ltd. Liab. Ltd. P'ship*, 375 Md. 522, 537, 826 A.2d 443 (2003).

## III.

### Motion For Judgment

#### *Corinaldi* And *Todd*

Both parties contend that the recent decision of this Court in *Corinaldi v. Columbia Courtyard, Inc.*, 162 Md.App. 207, 873 A.2d 483, *cert. dismissed*, 389 Md. 124, 883 A.2d 914 (2005), controls our decision here.[8] In *Corinaldi*, a wrongful death case, the appellants sued for negligence when their son was shot while attending a party in the appellee's hotel. Reversing the grant of summary judgment in favor of the hotel, we determined that a reasonable jury could have determined both that the hotel knew of the danger and could have acted in time to prevent it. *See id.* at 227–28, 873 A.2d 483. There was evidence that a hotel employee was informed approximately 10 minutes before the shooting that someone at the party had a gun and, thus, could have acted upon that information to protect the guests by calling the police immediately. In so concluding, we relied on *Todd v. Mass Transit Admin.*, 373 Md. 149, 816 A.2d 930 (2003).

In *Todd*, the plaintiff sued the MTA for injuries suffered when he was attacked on an MTA bus by a group of juveniles. As soon as they boarded the bus, the juveniles began "cursing[,]" "irritating[,]" and "harass[ing]" other passengers, who complained to the bus driver. *See id.* at 152, 816 A.2d 930. About five minutes later, the group began to attack the plaintiff. The other riders yelled to the driver to stop the bus because the juveniles were "beating [him] up." *Id.* at 153, 816

---

8. *Corinaldi* had not been decided when the trial court below granted the restaurant's motion for judgment.

A.2d 930. The driver, who at that point was attempting to cross a bridge on which traffic was stopped to watch the Fourth of July fireworks, did not stop the bus immediately. Rather, he maneuvered the bus through the stopped traffic to the other side of the bridge, where he finally stopped the bus and pressed the panic button. On these facts, the Court of Appeals overturned the grant of summary judgment in the MTA's favor, finding that there was sufficient evidence from which a reasonable jury could have concluded that the bus driver "had knowledge that the assault . . . was imminent" and "that this knowledge existed far enough in advance of the assault for MTA to have taken preventative action." *Id.* at 164, 816 A.2d 930.

The Veytsmans contend that there was similar evidence that the New York Palace had knowledge of danger and ability to prevent the assault on them. The New York Palace, on the other hand, distinguishes *Corinaldi* and *Todd*, claiming that it did not have the same sort of notice or delay during which it could have acted to protect the Veytsmans.

In *Corinaldi*, we synthesized Maryland case law into three general theories on which a landowner may be held liable when someone is injured by third party criminal activity on his premises, providing examples of each type:

- The first is when "the plaintiff's claim was based on an asserted duty to eliminate conditions that contributed to the criminal activity, such as providing security personnel, lighting, locks, and the like" and when "[t]he asserted duty was based on knowledge of prior similar incidents, not on knowledge of facts relating to the incident in question and prior to its culmination." *Id.* at 223, 873 A.2d 483.

- The second is when "[t]he plaintiff's claim of negligence was based on knowledge possessed by the invitor/landlord with respect to prior conduct of the *assailant* that allegedly made the assault foreseeable and preventable." *Id.* at 224, 873 A.2d 483.

- The third is "not based on prior similar incidents, either generally or involving the unknown [assailant]," but "[i]n-

stead, ... is based on an assertion that [the landowner] had knowledge of events occurring on the premises, prior to and leading up to the assault, which made imminent harm foreseeable." *Id.*

The Veytsmans concede that their case does not resemble the second of these scenarios, but do rely on the first and third to argue that the New York Palace owed them a duty of care.

## Knowledge Of Prior Similar Incidents

■ Under the first theory, the Veytsmans claim that the restaurant had knowledge of the potential for violence because of "the prior incidents on the premises, coupled with the prior use of security" and "the arbitrary decision to not use security" anymore. The Court of Appeals summed up this theory best in *Scott v. Watson,* 278 Md. 160, 169, 359 A.2d 548 (1976):

[I]f the landlord knows, or should know, of criminal activity against persons or property in the common areas, he then has a duty to take reasonable measures, in view of the existing circumstances, to eliminate the conditions contributing to the criminal activity. We think this duty arises primarily from criminal activities existing on the landlord's premises, and not from knowledge of general criminal activities in the neighborhood.

We do not agree that the facts of the Veytsmans' case, even viewed in the light most favorable to them, support the use of this theory. In *Corinaldi,* we explained that this theory usually applies when "an assailant entered the premises without invitation and without knowledge of the defendant." *Corinaldi,* 162 Md.App. at 223, 873 A.2d 483. The assailants here, however, were present as business invitees of the New York Palace. Most importantly, there was no testimony that any "prior incidents" occurred at the restaurant. Evidence of only *one* "incident" was adduced at trial. This involved a dispute between a husband and wife. It clearly is not similar to a brawl among patrons of the restaurant and is not the type of "criminal activity" that gives rise to a legal duty to "eliminate

the conditions contributing to" said activity. *See Scott*, 278 Md. at 169, 359 A.2d 548.

Even though the restaurant had used security before, the evidence was that it was no longer needed because business had slowed down. Moreover, the New York Palace had a policy of not having security for wedding receptions and private parties. And, this particular reception was hosted by a couple who knew the New York Palace's owners and had dined at the restaurant many times before. In the absence of any evidence from which a reasonable inference can be drawn as to why the New York Palace should have been expected to hire security on this particular night, we decline to hold that the restaurant owed the Veytsmans a duty to do so. *See Moore v. Jimel, Inc.*, 147 Md.App. 336, 349, 809 A.2d 10 (2002)(because there was "no evidence of any prior crime having been committed against a customer on the premises, there was no foreseeability of risk as to create a special duty in that regard"); *Smith v. Dodge Plaza Ltd. P'ship*, 148 Md.App. 335, 345–46, 811 A.2d 881 (2002), *cert. denied*, 374 Md. 84, 821 A.2d 371 (2003)(two incidents of violence within nightclub were "legally insufficient, in and of themselves, to put [landlord] on constructive notice of a danger to patrons of criminal activity within [the club] beyond that normally encountered in urban society").

### Knowledge Of Events Leading Up To The Assault

The Veytsmans also rely on the third of the *Corinaldi* theories, in which "knowledge of events occurring on the premises, prior to and leading up to the assault, . . . made imminent harm foreseeable." *Corinaldi*, 162 Md.App. at 224, 873 A.2d 483. They maintain that the New York Palace's knowledge of "unlawful consumption of alcohol on the premises for over seven hours[,]" as well as its awareness "of a volatile situation" within the restaurant, made the assault foreseeable. They assert that the restaurant had the ability to prevent the attack because Nemirovsky, outside with the bus, could have stopped the men from going back inside the restaurant. Or, they claim, an owner or member of the

restaurant staff could have called 911 when the men reentered.[9] Finally, they suggest that Levin could have forced either them or the remaining wedding guests to leave after he broke up the first incident in the ladies' room.

We have not found a Maryland case that is factually analogous to this one, in which a patron of a restaurant or tavern sued the establishment for negligence after he was injured by the violence of another patron inside the establishment. The two cases that come the closest are *Todd* (bus passenger assaulted by another passenger) and *Corinaldi* (hotel guest shot by another guest). In *Todd*, the Court concluded that a jury could have found that the bus driver was aware of the rambunctious behavior of the juveniles from the moment they boarded, there was a five minute delay before the assault, and the bus driver failed to stop the bus immediately upon learning that the assault had begun. *See Todd*, 373 Md. at 159, 816 A.2d 930. In *Corinaldi*, the jury could have found that the hotel was made aware that a guest had a gun ten minutes before the fatal shooting. *See Corinaldi*, 162 Md.App. at 228, 873 A.2d 483.

We agree with the New York Palace that there was not evidence of the same sort of notice and time delay present here as there was in *Todd* and *Corinaldi*.[10] In other words,

---

**9.** The Veytsmans do not contend that *once the assault began,* the New York Palace could have acted more quickly to prevent further harm.

**10.** Both *Todd* and *Corinaldi* involved appeals from the grant of summary judgment. The Court in *Todd* explained that "[a]lthough whether one party owes a duty of care to another is ordinarily a legal question for the court to decide," the existence of a duty was "predicated on" facts that were in dispute, preventing the grant of summary judgment. *See Todd v. Mass Transit Admin.*, 373 Md. 149, 159, 816 A.2d 930 (2003). The same was true in *Corinaldi*. *See Corinaldi v. Columbia Courtyard, Inc.*, 162 Md.App. 207, 228, 873 A.2d 483, *cert. dismissed*, 389 Md. 124, 883 A.2d 914 (2005).

As we are considering the grant of a motion for judgment, however, our role is not to determine whether there are facts in dispute. Rather, we must review the evidence in the light most favorable to the Veytsmans, and decide whether this evidence was sufficient, as a matter of law, to establish a legal duty. *See James*, 74 Md.App. at 484, 538 A.2d 782.

even viewing the evidence in the light most favorable to the Veytsmans, there is no evidence allowing a reasonable inference that the New York Palace was made aware of the potential for, to use the Veytsmans' term, "a volatile situation" until the actual assault began.

The restaurant's manager, Drakh, testified that there was nothing untoward about the behavior of the wedding guests during the reception. Even the waiter who was "scared" of the "big" men at the wedding stated that they were not fighting or "doing anything bad."

We do not agree with the Veytmans that the initial altercation in the bathroom put the restaurant on notice of an impending brawl. None of the men who later assaulted the Veytsmans was directly involved in the bathroom incident. Levin testified that, when Mrs. Barmak suggested to her husband after the bathroom altercation that he was "supposed to fight for [her]," neither Mr. Barmak nor Mr. Veytsman wanted to fight. To the contrary, the Veytsmans personally reassured Levin, saying "don't worry, Sam, everything is fine. It's okay." According to Levin, everything calmed down, and most of the wedding party, including all of the future assailants, had left the restaurant to board the charter bus. There was no one remaining in the restaurant except the bride, her sister and mother, and the Veytsmans and Barmaks. Thus, there is insufficient evidence to raise an inference that the New York Palace was unreasonable in failing to demand after the bathroom incident that some of its patrons leave the restaurant immediately.

As for the men on the bus, Nemirovsky testified that he did not know why the men returned to the restaurant. Because he was standing at the door with one of the newly married couple's fathers, he merely stood by as they reentered the lobby. Although both Nemirovsky and Drakh did observe a loud, rude conversation take place inside moments before the fight broke out, they did not hear what it was about. "A verbal altercation alone is insufficient to presage physical violence" in these circumstances. *See Corinaldi*, 162 Md.App.

at 227, 873 A.2d 483. Without knowledge of what would be said or done by the men from the bus once they reentered the restaurant, the New York Palace was not obligated to lock them out.

Nor does testimony that the men "came to have a fight because the women were insulted" persuade us that there was sufficient evidence to establish a duty to prevent or protect in this case. The evidence was undisputed that the assault occurred quickly once the parties confronted each other. Given the quick progression from conversation to physical conflict, the New York Palace did not have a duty to call for police or emergency assistance.

■ We finally examine the Veytsmans' claim that the intoxication of the wedding party guests put the restaurant on notice that violence might occur. In Maryland, there remains no cause of action "for damages against the owner of a tavern for injuries to third persons caused by the bar owner's intoxicated patrons[.]"[11] *Wright v. Sue & Charles, Inc.*, 131 Md. App. 466, 474, 749 A.2d 241, *cert. denied*, 359 Md. 670, 755 A.2d 1140 (2000). The same holds true when the injury "occur[s] to the intoxicated individual himself rather than to an innocent third party[.]" *Id.* In *Wright*, Judge Moylan wrote a trenchant history of the Maryland appellate decisions reviewing this rule, concluding that they have consistently declined to do so in the absence of legislative action. *See id.* at 474–75, 749 A.2d 241.

In one of these cases, *Felder v. Butler*, 292 Md. 174, 438 A.2d 494 (1981), the Court of Appeals considered, but declined to follow, the many other jurisdictions that have imposed civil liability upon sellers of alcoholic beverages.

Whether Maryland should abandon the rule in [*State v. Hatfield*, 197 Md. 249, 78 A.2d 754 (1951)] and align itself

---

11. As of 2000, Maryland was one of only three jurisdictions that followed this rule. *See Wright v. Sue & Charles, Inc.*, 131 Md.App. 466, 475 n. 5, 749 A.2d 241, *cert. denied*, 359 Md. 670, 755 A.2d 1140 (2000). The other two states were Nebraska and Nevada. This appears to still be true.

with the new trend of cases which impose civil liability upon vendors of alcoholic beverages for the torts of their inebriated patrons depends ultimately upon which line of authorities, all things considered, best serves the societal interest and need. That determination clearly impacts on the development of the law relating to the dispensing and consumption of alcoholic beverages, a subject long pervasively regulated by the legislature. The absence of any statute in Maryland creating a civil cause of action in such circumstances prompted the Court in *Hatfield* to conclude that the legislature did not intend to impose civil liability upon alcoholic beverage vendors for the tortious acts of their intoxicated customers. . . . [S]ince the legislature has not yet created dram shop liability by statute, we decline, for now, to join the new trend of cases[.]

*Id.* at 183–84, 438 A.2d 494 (citations omitted).

Most "dram shop" cases, as they are known, differ from this case in that they involve intoxicated patrons injuring an innocent third party or themselves, outside of the establishment. This case presents an issue of first impression in that the plaintiffs were also patrons of the establishment, who were injured while inside the business premises.

■ A restauranteur or tavern operator, like any other business owner, may be liable for injuries to its customers proximately caused by its negligence if it had knowledge of the potential for danger and the ability to prevent it. *See Todd*, 373 Md. at 159, 816 A.2d 930. Drunk and disorderly behavior leading up to assault is certainly one factor to consider in determining whether these criteria have been met in a claim for injuries from assault. We find useful the following rubric proposed by the Supreme Court of Montana:

Reviewing the leading cases from other jurisdictions, . . . we find the general rule to be that the duty of a tavern keeper to protect a patron from injury by another arises only when one or more of the following circumstances exist:

(1) A tavern keeper allowed a person on the premises who has a known propensity for fighting.

(2) The tavern keeper allowed a person to remain on the premises whose conduct had become obstreperous and aggressive to such a degree the tavern keeper knew or ought to have known he endangered others.

(3) The tavern keeper had been warned of danger from an obstreperous patron and failed to take suitable measures for the protection of others.

(4) The tavern keeper failed to stop a fight as soon as possible after it started.

(5) The tavern keeper failed to provide a staff adequate to police the premises.

(6) The tavern keeper tolerated disorderly conditions.

*Nevin v. Carlasco*, 139 Mont. 512, 365 P.2d 637, 638 (1961) (citations omitted). *See also* Joan Teshima, Annotation, *Tavernkeeper's liability to patron for third person's assault*, 43 A.L.R.4th 281 (1986).

The Veytsmans do not argue that the first or fourth of these scenarios applies. We have already rejected the fifth in our discussion above. This leaves the second, third, and sixth, which we perceive to be quite similar to each other.

We are not persuaded that under any interpretation of the facts, the New York Palace owed a duty to the Veytsmans to protect them from the intoxicated wedding guests. There was no testimony that their alcohol consumption caused the wedding guests to exhibit "obstreperous and aggressive" conduct. On the contrary, as we stated earlier, the manager and co-owner both testified that the behavior of the wedding guests, while perhaps a bit rowdy, was nothing out of the ordinary, let alone "disorderly" or violent. When the men from the bus reentered the restaurant, they did have an angry discussion, but we have already concluded that this alone was insufficient to put the New York Palace on notice that these men "endangered others" or that others required "protection" from them.

Our review of cases from other jurisdictions reveals that a tort duty is only found in cases more egregious than this one, and is rejected in cases more similar. For example, in a case involving a bar fight in which the assailant hit the plaintiff

over the head with a beer mug, the Supreme Court of Minnesota declined to find that the tavern owner owed the victim a duty because "[t]he evidence presented on this claim was limited to testimony that [the assailant] looked both like he was obviously intoxicated and angry that night" and that "[a]nother witness also stated that he saw [the assailant] 'half-slam' his beer down on the table." *Boone v. Martinez*, 567 N.W.2d 508, 511 (Minn.1997). Relying on Minnesota law that requires a plaintiff to prove, among other facts, that "the proprietor [was] put on notice of the offending party's vicious or dangerous propensities by some act or threat," the court concluded "that this evidence was not sufficient to present the jury with a fact question of whether the bar was aware of [the assailant's] vicious propensities." *Id.* at 510–11.

In a case that is somewhat similar to the Veytsmans', the Supreme Court of Nebraska upheld a directed verdict entered for a bar owner on the ground that the evidence was insufficient to show that the assault on the plaintiff was foreseeable and that the owner could have prevented it. In *Vice v. Darm Corp.*, 224 Neb. 1, 395 N.W.2d 524 (1986), there had been a fight involving two women in the bar earlier that evening. When the manager "went to see what the problem was[,]" the women apologized to him and "indicated there was no problem[.]" *Id.* at 525. The manager "believed the incident was a momentary thing, maybe a misunderstanding, that was sufficiently settled[.]" *Id.* About an hour later, the women's brothers became involved in a physical altercation, during which the plaintiff was injured. The court determined:

> [A]s a matter of law[,] the argument between [the women] did not make it foreseeable that their brothers would later arrive and get involved in a fight, at the start of which plaintiff would be injured ... On the contrary, the initial disturbance involving the two women had subsided; plaintiff was injured just as a sudden and unexpected fight broke out without warning between the brothers.

*Id.* at 527.

The Court of Appeals of Wyoming, on the other hand, upheld a jury verdict entered for the plaintiff who was assault-

ed in a bar after the aggressor "approached [him] several times threatening him in a loud and vulgar manner. On one occasion [the assailant] grabbed [the plaintiff's] shirt." *Mayflower Restaurant Co. v. Griego*, 741 P.2d 1106, 1108 (Wyo. 1987). The court allowed the verdict to stand on the grounds that, first, the bar was on notice that the plaintiff was in imminent danger because the assailant "was loud and vulgar so as to attract the attention of those in the bar," and because people in the bar saw him grab the plaintiff's shirt. *See id.* at 1114. Second, there was evidence that the assault was allowed to continue for an unreasonable amount of time before the tavern acted. *See id.* Neither of those factors are present here.

A Louisiana court also determined that a tavern owner owed a duty to a plaintiff who was assaulted in the bar by one of its frequent customers, who had been involved in another fight there only a few days earlier. *See Atkins v. Frazell*, 470 So.2d 505 (La.Ct.App.1985). The court found that the bar manager was aware "that trouble was brewing and a fight was imminent, based on:"

> (1) his opportunity to hear the verbal exchange between [the assailant] and plaintiff who were a few feet distance from him; (2) his opportunity to hear [the assailant's] threat to 'stomp out' plaintiff's eyes; (3) his opportunity to see [the assailant] break [a] pool cue . . . (6) and his watching, as an interested spectator, the brutal beating from his 'ring-side' seat once the mayhem started rather than following his employer's standing orders [to immediately call the police when a fight occurs in the bar][.]

*Id.* at 514. Again, the Veytsmans' evidence is not as strong, because there was no explicit threat by the men before the assault, and the restaurant personnel did not stand idly by when violence started.

 The Veytsmans emphasize that the wedding guests brought their own vodka into the restaurant. Pointing out that it is against Maryland law for "any [liquor] license holder to permit any person to drink any alcoholic beverage not

purchased from the said license holder on the premises covered by the license[,]" Md.Code (1957, 2005 Repl.Vol.), Art. 2B § 12–107(b)(2), they maintain that evidence of this violation was sufficient to get the case to the jury. Violation of a statute, however, is merely evidence of negligence and is not sufficient to create a legal duty unless the statute was designed to do so. *See Erie Ins. Co. v. Chops,* 322 Md. 79, 84, 86, 585 A.2d 232 (1991). There is no evidence that the General Assembly intended the section 12–107(b)(2) restriction to impose on taverns who violate this law strict civil liability for the acts of persons who became intoxicated from drinking their own alcohol on the tavern premises.

In *Joyce v. Hatfield,* 197 Md. 249, 254–255, 78 A.2d 754 (1951), the Court of Appeals rejected civil liability for the sale of alcohol to a minor in violation of a statute. More recently, in *Fisher v. O'Connor's, Inc.,* 53 Md.App. 338, 452 A.2d 1313 (1982), *cert. denied,* No. 523, Sept. Term 1983 (1983), we rejected a claim that selling alcohol to an intoxicated person in violation of the liquor laws gives rise to a civil cause of action against the tavern owner. Declaring that "[t]he precept of law that 'violation of a statute is evidence of negligence' is a rule of evidence not the creation of a substantive cause of action[,]" we followed the common law rule against dram shop liability:

> The only statute of the General Assembly concerning the sale of alcoholic beverage to intoxicated persons is codified as Md. Ann.Code art. 2B, § 118. Although that act declares it to be a misdemeanor to sell alcoholic beverages to an intoxicated person, it does not create a civil cause of action against the bar or tavern owner. Absent an act of the Legislature sanctioning, under circumstances similar to those of the matter sub judice, a civil suit against bar or tavern owners, there is no liability for injuries to intoxicated patrons.

The *Hatfield* and *Fisher* decisions make particular sense under the facts of this case, because there was no evidence that allowing the wedding group to drink their own alcohol, by itself, created an unreasonable risk of physical harm to the

Veytsmans. To impose liability on the New York Palace because it violated this statute would create dram shop liability through the back door of a liquor license violation. This we will not do.

In sum, in the light most favorable to the Veytsmans, their evidence regarding the wedding guests' drunk and/or disorderly conduct was essentially that it "looked like" the men were drunk and were "looking for a fight." There was no evidence of threats, "vulgar" behavior, grabbing, destruction of property, or other indication that the men from the bus would assault the Veytsmans until the moment it happened. Additionally, as in the Nebraska case, the "initial disturbance" involving the women in the restroom had subsided; the New York Palace could not have foreseen from that event that a group of men who were not involved in that incident would learn about it, leave the charter bus, reenter the restaurant, provoke an altercation, and then assault the Veytsmans. We therefore conclude that the evidence was legally insufficient to create a duty on the part of the New York Palace to prevent the assault or to protect the Veytsmans against it.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED. COSTS TO BE PAID BY APPELLANTS.**