918 A.2d 1230

Michael Singer JOSEPH

v.

BOZZUTO MANAGEMENT COMPANY et al.

No. 0322, Sept. Term, 2006.

Court of Special Appeals of Maryland.

March 15, 2007.

---

306

Joel D. Joseph, Bethesda, MD, for Appellant.

Karen L. Federman–Henry, Rockville, MD, Kevin P. Sullivan (Michael W. Skojec, Gallagher, Evelius & Jones L.L.P., on the brief), Baltimore, MD, for Appellee.

Panel: KRAUSER, MEREDITH and CHARLES E. MOYLAN, JR., (retired, specially assigned), JJ.

MOYLAN, J.

This appeal is from a slip-and-fall case, not from a lead-paint case. The difference is critical to the outcome. Both types of cases, to be sure, involve, in a very general sense, the responsibility of landowners or landlords to keep property owned by them reasonably free of risk to users of the property. At about that level of abstraction, however, the similarities cease. The respective types of cases are of the same genus, perhaps, but they are very different species. Strained analogies are treacherously inappropriate, therefore, and a recent change in the lead-paint caselaw effected by *Brooks v. Lewin Realty III, Inc.*, 378 Md. 70, 835 A.2d 616 (2003), has no bearing whatsoever on the slip-and-fall case now before us.

On October 13, 2004, the appellant, Michael Singer Joseph, brought suit against the appellees, the Housing Opportunities Commission of Montgomery County ("HOC") and the Bozzuto Management Company, in the Circuit Court for Montgomery County, alleging that negligence on their part resulted in a knee injury he sustained following a slip–and–fall on property owned or maintained by them. Both appellees filed motions for summary judgment, contending that, based on the undisputed facts, the appellant had not shown a *prima facie* case of negligence. On March 9, 2006, Judge Joseph A. Dugan, Jr., granted summary judgment in favor of both appellees. The appellant has taken this timely appeal from that grant of summary judgment.

## Factual Background

The Metropolitan is a 13–story apartment building at 7620 Old Georgetown Road in Bethesda, Maryland, owned by the

HOC.. It is managed by the Bozzuto Management Company. Joel Joseph, who is both the father of the appellant and his attorney in this case, is a resident of the Metropolitan with an apartment on the tenth floor. The appellant is a resident of Boulder, Colorado, but, in August of 2004, was visiting his family in the Washington area and was staying with his father at the Metropolitan.

On the evening of August 20, 2004, at approximately 6 p.m., the appellant was scheduled to meet with his mother in the lobby and to go out to dinner. Instead of using the elevator, he decided to walk down the ten flights of stairs. Walking just behind him was his younger brother, 17–year–old Alex Joseph. According to the complaint, as the appellant approached the eighth floor landing "he slipped on an oily substance and fell violently to the concrete floor, hitting his knee on the floor." At the time that he slipped, the appellant was not using the hand rail.

### The "Oily Substance"

The appellant, in his pretrial deposition, described the "oily substance" on which he slipped as translucent and colorless.

Q. And what color was the substance?

A. It's translucent.

Q. So it was clear?

A. It was colorless.

In terms of the size of the "oily" spot, the appellant based his estimate on the one-foot square tiles that covered the floor of the eighth floor landing. He estimated that the oily spot covered between 15% and 20% of one of the tiles. Although the lighting in the stairwell was good, the appellant stated that he did not see the oily spot before he slipped on it. The appellant was not sure whether, had he been looking straight down, he would have seen the oily patch.

Q For clarification, I want to ask you a question again. As you were descending the stairs and you were looking generally toward the forward motion that you were making,

*if you had been looking directly at the floor, would you have been able to see this substance?*

A *It's possible. I don't know.* It's possible. I mean it depends were you looking at a given moment in time? There's a lot of space in that stairwell so if I would have been looking directly down, would I have seen it? The chances are high. Directly down at a given moment, sure.

Q You're saying if you had been looking directly down at this tile where this spot, the greasy spot was, if you'd been looking down on it as you were just about to step on to that tile, would you have been able to see it, knowing now what it looked like and where it was, if you went back and looked at it after you fell?

A I'm not sure. I'm not sure. I couldn't be sure of something like that.

Q Why not?

A Why not? Because it didn't happen and as you can tell from the picture, *at different angles,* that *substances give off a different reflection* as well. *So, at a given angle, if I were looking down at it, I may not have seen it or at another angle, I may have seen it.*

(Emphasis supplied).

In his deposition, Alex Joseph also testified that, although he could see the floor and the stairs in front of his brother, he saw nothing abnormal on the floor.

Q And *could you see the floor and the stairs that were in front of him?*

A *Yes.*

. . . .

Q *What did you see on the floor, if anything, before he fell?*

A *I couldn't see anything. It looked normal.*

. . . .

A I could see clearly where he was walking, yes.

Q You could see the whole landing?

A Yes.

Q And how was the lighting in the stairwell?

A It was good.

Q Any problems seeing the stairs as you guys went down?

A No. I could see fine.

(Emphasis supplied).

After the appellant slipped and fell, Alex Joseph looked to see what had caused the slip. He described it:

Q What did you see?

A *I saw a shiny substance on the floor?*

Q What color was it?

A *It was clear.*

. . . .

A It wasn't really a puddle. It was like a smudge on the floor.

Q A smudge, can you describe that a little bit better for us?

A *It was kind of greasy. It was like smeared on the floor.* That's how I can describe it.

(Emphasis supplied).

No one else ever saw the oily substance. On the afternoon after his fall, the appellant reported the incident to Antonio Muniz, the maintenance supervisor at the Metropolitan apartment house. In a deposition, Muniz described his actions in response to the appellant's report of the fall.

Q. Do you know what the substance was that was on the steps?

. . . .

THE WITNESS: *I don't know of any substance on the steps at all. When I inspected it there was nothing.*

Q. When did you inspect it?

A. Right after a conversation I had with Mr. Joseph.

Q. You talked to Michael Joseph?

A. Yes.

Q. When did you talk to him?

A. I think it was about 2:30 that afternoon, the same day.

Q. That was after he fell?

A. Yes. Or the next morning. The next afternoon actually.

Q. The next afternoon?

A. Yes.

Q. When did you go and inspect then after you were informed?

A. *Right after the conversation with him.* He went upstairs and *I immediately went and checked there.*

Q. *What did you find when you inspected?*

A. *Nothing.* I also checked all the other stair towers as well just to make sure—see if maybe he was mistaken which one it was. I went ahead and checked everything.

(Emphasis supplied).

## The Inspection and Cleaning Routine

Antonio Muniz was employed by Bozzuto as the building superintendent for the Metropolitan. In addition to Muniz, Bozzuto directly employed a housekeeper and three maintenance technicians at the Metropolitan. In his deposition, Muniz testified that each of the maintenance technicians would generally walk and clean the common areas of the Metropolitan on a daily basis. Muniz also testified that he himself had inspected the stairwells during the week immediately preceding the appellant's fall.

Q. Did you inspect that stair tower before the accident took place?

A. *Some time that week I had inspected all the stair towers. I'd walk them on a weekly basis.*

(Emphasis supplied).

Bozzuto hired an independent contractor, Gali Services Inc., to handle the actual cleaning and maintenance of the Metropolitan's common areas, including the stairwells. It was Mun-

iz's belief that the Gali employees checked and cleaned the stairwells three times a week.

Q. How often are the stairs or the stair towers as you said cleaned at The Metropolitan?

A. ... [T]here was a foreman that oversaw all the cleaning of the stairs and the carpets in the corridors and everything, so he had his own schedule as far as the cleaning goes.

*I think they tried to hit everything three times a week.*

Q. *Three times a week?*

A. *Yes.* Along with vacuuming the corridors and cleaning the stair towers.

(Emphasis supplied).

### A Claim of Negligence

We shall first examine this case by applying the general principles of tort law on the subject of landowner liability in slip-and-fall cases. In *Valentine v. On Target*, 353 Md. 544, 549, 727 A.2d 947 (1999), Judge Karwacki listed for the Court of Appeals the required elements necessary to establish landowner liability based on negligence:

To maintain an action in negligence, the plaintiff must assert in the complaint the following elements: "(1) that the defendant was under a duty to protect the plaintiff from injury, (2) *that the defendant breached that duty,* (3) that the plaintiff suffered actual injury or loss, and (4) that the loss or injury proximately resulted from the defendant's breach of the duty."

(Emphasis supplied). See also *Moore v. Jimel,* 147 Md.App. 336, 337–38, 809 A.2d 10 (2002); *Corinaldi v. Columbia,* 162 Md.App. 207, 218, 873 A.2d 483 (2005).

There was no dispute over the facts 1) that the appellant was an invitee at the Metropolitan and 2) that both appellees accordingly owed him the duty to exercise ordinary care for his safety in maintaining the common areas of the Metropolitan.

## The Prerequisite of Knowledge For a Breach of Duty

■ The critical element in this case was the second, to wit, the establishment that the appellees, owing a duty to the appellant, breached that duty. In order to sustain a cause of action against the appellees for breaching that duty, however, the appellant must prove not only that a dangerous condition existed but also that the appellees "had actual or constructive knowledge of the dangerous condition and that the knowledge was gained in sufficient time to give [them] the opportunity to remove it or to warn the invitee." *Rehn v. Westfield America,* 153 Md.App. 586, 593, 837 A.2d 981 (2003), *cert. denied,* 380 Md. 619, 846 A.2d 402 (2004). See also *Giant Food, Inc. v. Mitchell,* 334 Md. 633, 636, 640 A.2d 1134 (1994); *Moulden v. Greenbelt Consumer Services, Inc.,* 239 Md. 229, 232, 210 A.2d 724 (1965); *Tennant v. Shoppers Food Warehouse,* 115 Md. App. 381, 389–90, 693 A.2d 370 (1997) ("[t]he mere existence of a defect or danger is generally insufficient to establish liability, unless it is shown to be of such a character or of such duration that the jury may reasonably conclude that due care would have discovered it."); *Reitzick v. Ellen Realty, Inc.,* 30 Md.App. 273, 352 A.2d 327 (1976) (dismissing tenant's slip-and–fall claim against landlord for failure to demonstrate that landlord had actual or constructive knowledge of dangerous condition).

An unambiguous statement of the knowledge requirement is that by Judge Henderson for the Court of Appeals in *Lexington Market Authority v. Zappala,* 233 Md. 444, 445–46, 197 A.2d 147 (1964):

The plaintiff was a business invitee, to whom the proprietor owed a duty to exercise ordinary care to keep the premises in a reasonably safe condition. *Nalee, Inc. v. Jacobs,* 228 Md. 525, 529, 180 A.2d 677; *Rawls v. Hochschild, Kohn & Co.,* 207 Md. 113, 117, 113 A.2d 405; *Moore v. American Stores Co.,* 169 Md. 541, 546, 182 A. 436. See also the cases in 62 A.L.R.2d 6. But *the burden is upon the customer to show that the proprietor created the dangerous condition or had actual or constructive knowledge of its existence. Montgomery Ward v. Hairston,* 196 Md. 595, 78 A.2d 190;

*Rawls v. Hochschild, Kohn & Co., supra.* In the cases last cited the issue was withdrawn from the jury.

> The plaintiff in the instant case did not observe any oil or grease on the floor when she parked her car. When she returned less than two hours later, she slipped while attempting to enter her car from the passenger side. *For all we know, the oil or grease may have leaked from a car occupying the space beside her car, only a few moments before she returned.* She did not see the oil or grease before she slipped. She had a large paper bag in her arms. It may well be that a garage keeper should anticipate that oil or grease may occasionally leak from parked cars, but *he is not an insurer and we think it would be unreasonable to hold that it is his duty to continuously inspect and sand down any and all leakage as soon as it occurs,* even if we assume that periodic inspections are necessary.

(Emphasis supplied).

█ In *Maans v. Giant,* 161 Md.App. 620, 623, 871 A.2d 627, *cert. denied,* 388 Md. 98, 879 A.2d 43 (2005), this Court affirmed the granting of judgment in favor of a storeowner because the plaintiff "had failed to prove that Giant had either constructive or actual pre-injury knowledge of the wet floor." In terms of constructive knowledge, moreover, it is necessary for the plaintiff to show how long the dangerous condition has existed.

> Appellant failed to produce any evidence that had Giant made reasonable inspections prior to the accident it would have discovered the water on the floor in time to prevent the accident. *For all that was shown by appellant, the water could have been spilled by a customer seconds before her fall. This is fatal to her argument that Giant is liable because it breached its duty to make reasonable inspections. See Burkowske,* 50 Md.App. at 523, 439 A.2d 40 (To prove liability, an invitee must show that if the owner/occupier had made reasonable inspections, the defect would have been discovered in time to prevent the invitee's injury.). *See also Deering Woods,* 377 Md. at 267–68, 833 A.2d 17 (to show constructive knowledge, *invitee must demonstrate that de-*

*fective condition existed long enough to permit one under a duty to inspect to discover the defect and remedy it prior to the injury).*

161 Md.App. at 632–33, 871 A.2d 627 (emphasis supplied).

Judge Salmon explained the merit behind the Maryland requirement.

*The Maryland rule* has two purposes: (1) it *requires a demonstration of how long the dangerous condition existed prior to the accident so that the fact-finder can decide whether the storekeeper would have discovered it if he or she had exercised ordinary care;* and (2) it also shows that the interval between inspections was at least as long as the time on the floor. Thus, *proof of time on the floor is relevant,* not only *as to notice but also as to the issue of what care was exercised.*

... *Without "time on the floor" evidence, the storekeeper would be potentially liable even though there is no way of telling whether there was anything Giant could have done that would have avoided the injury.*

161 Md.App. at 639–40, 871 A.2d 627 (emphasis supplied).

A similar result had been reached by the Court of Appeals in *Rawls v. Hochschild, Kohn & Co.,* 207 Md. 113, 123, 113 A.2d 405 (1955):

In any event, *even assuming that there was some water on the stairway before plaintiff fell, there was no evidence to indicate* how it had been brought there or *how long it had been there.* Therefore, we find that *the alleged dangerous condition, namely the water on the stairway, was not such as to warrant the inference that it had been there long enough to have enabled defendant to discover and correct it by the exercise of ordinary care.*

For these reasons we hold that there was no legally sufficient evidence that defendant was guilty of negligence. (Emphasis supplied).

### The Absence of Proof of Knowledge

The appellant himself testified that he had used the stairwell in question twice—once ascending and once descending—

in the two-day period immediately preceding his August 20 fall. His testimony shed no light either 1) on how long the oily substance had been on the floor or 2) on any actual or constructive knowledge on the part of the appellees.

Q. *Do you know how long the substance was on the floor* before you slipped?

A. *No.*

Q. *Do you know if anyone had reported the substance* to any personnel or management in the building prior to when you slipped?

A. *No.*

\* \* \*

Q. You have no idea how the greasy substance got there, right?

A. Not one clue.

Q. *You have no idea how long it was there before you slipped on it?*

A. *No I don't.*

Q. *Do you know, prior to your fall, how recently someone from Bozzuto or the HOC walked that stairwell?*

A. *No.*

(Emphasis supplied).

The appellees, perhaps redundantly, proffered affirmative evidence to establish that they had no actual knowledge of the presence of the oily substance on the stairwell. They offered the affidavit of Bozzuto's assistant community manager for the Metropolitan.

1. I was employed by Bozzuto Management Company as the assistant community manager for the Metropolitan apartment complex located in Bethesda, Maryland ("the Metropolitan") from October 2003 through October 2005. I was the assistant community manager at the Metropolitan during the timeframe of the alleged incident involving Michael Joseph in August 2004.

*2. Prior to Michael Joseph's alleged slip[-]and[-]fall* on August 20, 2004, *management at the Metropolitan was not aware of any "oily substance" located on the floor of the eighth floor platform of any of the stairwells in the building. Nobody ever reported anything to management regarding any unidentified substance on the floor of any of the stairwells* at the Metropolitan prior to Mr. Joseph's alleged fall, and *management had not received any incident reports or complaints from anyone regarding any accidents* occurring in the stairwells *prior to Plaintiff's complaint.* (Emphasis supplied).

■ The appellant not only proffered no evidence to show that the appellees had actual or constructive knowledge of a dangerous condition, he did not even allege such knowledge in his complaint. By time-honored Maryland and common law standards, the appellant failed to show a case of negligence against the appellees. Summary judgment in their favor, by prevailing legal standards, was clearly in order, unless the appellant is able somehow to "trump" the otherwise prevailing law in slip-and-fall cases.

### Has *Brooks v. Lewin* Changed the General Law Of Landowner Liability?

To the otherwise foreclosing effect of having proffered no evidence of actual or constructive knowledge of a hazardous condition in the stairwell on the part of the appellees, the appellant's only response is to resort to wishful thinking. He looks to *Brooks v. Lewin Realty III, Inc.,* 378 Md. 70, 835 A.2d 616 (2003) as a *deus ex machina* descending on the courtroom just in the nick of time. He pins his hopes on an illusion.

The appellant's problem is that he proffered no evidence to show that the appellees had either actual or constructive knowledge of the oily substance on the stairwell. How then does he propose to finesse the knowledge requirement? He actually intertwines two arguments. He invokes *Brooks v. Lewin* directly as authority for the proposition that a showing

of knowledge on the part of the appellees is not required. He also invokes the evidentiary principle that in some circumstances, the violation of a statute or regulation may be evidence of negligence. He claims that the appellees violated § 29–30(a)(2) of the Montgomery County Code. He then claims, on the ostensible authority of *Brooks v. Lewin*, that the violation provides the evidence of the appellees' negligence necessary for his claim to survive summary judgment.

*Brooks v. Lewin*, according to the appellant, stands for the sweeping proposition that "when a landlord violates a housing ordinance there is no requirement that the landlord had actual notice of a hazardous condition." The appellant segues from *Brooks v. Lewin's* elimination of an absolute knowledge requirement in lead-paint cases to the more general proposition that in "an appropriate case, the violation of a statutory regulation is evidence of negligence." *Erie Insurance Co. v. Chops*, 322 Md. 79, 84, 585 A.2d 232 (1991); *Dean v. Redmiles*, 280 Md. 137, 151, 374 A.2d 329 (1977). From the combination of the two, he then distills the conclusion that, at least in terms of meeting the burden of production to survive summary judgment, the violation of a statute or regulation is *per se* enough to establish a *prima facie* case of negligence and to render the knowledge requirement superfluous. It behooves us to take a close look both at *Brooks v. Lewin* and at the evidentiary principle, both sequentially and in combination.

### Apples and Oranges

We look first at *Brooks v. Lewin*. As an initial overview, we make the general observation that the appellant is attempting to blend two strains of caselaw that are insoluble. To switch metaphors, he presents an imaginative effort to engraft *Brooks v. Lewin* onto the slip-and-fall caselaw, but the graft won't take. The attempted graft is simply incompatible in too many ways with the host tissue. Once one gets beyond the common denominator that both the landlord of a residential property and the owner of a grocery store or apartment house are property owners responsible, in various ways, for the

safety of users of the property, the situations are too disparate to permit of facile analogizing.

The lessor of a residential property contracts away the right of possession and, except perhaps for an occasional inspection or repair or maintenance obligation, does not maintain any presence on the premises. By contrast, the owner of a store or hotel or apartment house maintains, directly or through an agent, a regular presence and an ongoing responsibility for maintaining common areas.

In the lead-paint cases, the lessor's duty is owed essentially to the lessee or the lessee's immediate household. In the slip-and-fall cases, the property owner's duty is owed to random and unidentified invitees, in effect to the public at large. In the lead-paint cases, the nature of the hazard is quasi-structural and quasi-permanent (in Baltimore City, endemic to any house built before 1953). In the slip-and-fall cases, the nature of the hazard is fleeting and unpredictable. In the lead-paint cases, the duty to inspect (if, by statute, it exists at all) may well be satisfied if performed once before the lease is signed or intermittently every several years. In the slip-and-fall cases, the battle is regularly joined, as in this case, over the reasonableness of weekly or daily or even hourly inspections. Between the two types of cases, the circumstances and characteristics are simply too diverse to permit of any meaningful analogy.

### The Violation of a Statute As Evidence of Negligence

We will come back to *Brooks v. Lewin*, but we first turn our focus on the evidentiary principle that the appellant invokes. There is, to be sure, a legal principle that the violation of a statute or regulation may sometimes be evidence of negligence. It is a principle, however, that is carefully circumscribed. There must, first and foremost, be an actual violation of a statute or regulation, not simply a statute or regulation in existence that might be violated. The injury, moreover, must be of a type which the statute or regulation was specifically designed to prevent. *Hartford Insurance Co. v. Manor Inn*, 335 Md. 135, 155, 642 A.2d 219 (1994); *Garden-*

*village Realty v. Russo,* 34 Md.App. 25, 34, 366 A.2d 101 (1976). The plaintiff must also be a member of the class that the statute or regulation was designed to protect. *Liberto v. Holfeldt,* 221 Md. 62, 65–66, 155 A.2d 698 (1959); *Gosnell v. B. & O. Railroad,* 189 Md. 677, 57 A.2d 322 (1948); *Slack v. Villari,* 59 Md.App. 462, 471, 476 A.2d 227 (1984). The violation of the statute must constitute a breach of a legally cognizable duty owed by the defendant to the plaintiff. *Erie Insurance Co. v. Chops,* 322 Md. 79, 84, 585 A.2d 232 (1991). As we shall more thoroughly examine, the principle is, moreover, one that is logically far more efficacious for assessing certain types of negligence than for assessing others. It is not necessarily the case that "one size fits all," and that is why analogizing can be treacherous.

Our first examination will be of the Maryland caselaw that has recognized the principle. *Erie Insurance Co. v. Chops,* 322 Md. at 84, 585 A.2d 232, spelled out both the general principle and its limitations.

> *In an appropriate case, the violation* of a statutory regulation *is evidence of negligence,* and that negligence will be actionable if it is a proximate cause of injury or damage to the plaintiff. The Court of Special Appeals has noted that the breach of a statutory duty may be considered as *some evidence of negligence when the plaintiff is a member of the class of persons the statute was designed to protect and the injury was of the type the statute was designed to prevent.*
>
> *Essential* to the proof of any cause of action for negligence *is the establishment of a legally cognizable duty owed by the defendant to the plaintiff,* or to a class of persons to which the plaintiff is a member.

(Emphasis supplied).

In *Erie* there was an undisputed violation of § 17–106(b) of the Transportation Article, which requires an insurer to notify the Motor Vehicle Administration immediately of any termination of an insured's policy. Notwithstanding the violation of the statute, the plaintiff, who had been involved in an accident with the uninsured motorist, was not allowed to utilize the

violation as evidence of negligence against the insurance company.

> [W]e hold that *the duty imposed* upon Erie *by the statute was not a "tort duty";* that is, *the statute did not create a legally cognizable duty running from Erie to all persons who might thereafter suffer economic damage by* reason of *involvement in an accident with an uninsured motorist* upon Erie's failure to give immediate notice to the MVA of the termination of coverage. We further hold that *the legislature did not intend to create a new cause of action* imposing strict liability on an insurer who failed to give immediate notice of cancellation to the MVA.

322 Md. at 86, 585 A.2d 232 (emphasis supplied). The case was a negative example of the principle under discussion. And see *Aravanis v. Eisenberg,* 237 Md. 242, 259–60, 206 A.2d 148 (1965).

In *Joyce v. Hatfield,* 197 Md. 249, 78 A.2d 754 (1951), the defendant clearly violated the law by knowingly selling liquor to an intoxicated minor, who drove away from the tavern and struck another car causing the death of the plaintiff's husband. The Court of Appeals refused to accept the illegal sale as the proximate cause of the subsequent injury. The use of the violation as evidence of negligence did not even arise for discussion.

> The common-law rule holds the man who drank the liquor liable, and considers *the act of selling it as too remote to be a proximate cause of an injury caused by the negligent act of the purchaser of the drink.*

197 Md. at 255, 78 A.2d 754 (emphasis supplied).

*Veytsman v. New York Palace,* 170 Md.App. 104, 906 A.2d 1028 (2006), was a case in which the plaintiffs sought, unsuccessfully, to interpose a statutory violation by the defendant as sufficient evidence of negligence to save them from an adverse judgment as a matter of law. The restaurant owner/defendant clearly had violated § 12–107(b)(2) of Article 2B by permitting patrons to drink alcoholic beverages not purchased

on the premises. It was those patrons who got intoxicated and assaulted the plaintiffs.

The Veytsmans emphasize that the wedding guests brought their own vodka into the restaurant. *Pointing out that it is against Maryland law for "any [liquor] license holder to permit any person to drink any alcoholic beverage not purchased from the said license holder* on the premises covered by the license[,]" *they maintain that evidence of this violation was sufficient to get the case to the jury.*

170 Md.App. at 126–27, 906 A.2d 1028 (emphasis supplied).

This Court, speaking through Judge Adkins, held that the violation of the statute, though itself clear, did not satisfy the plaintiffs' burden of production.

*Violation of a statute,* however, *is merely evidence of negligence and is not sufficient to create a legal duty unless the statute was designed to do so.* There is no evidence that the General Assembly intended the section 12–107(b)(2) restriction to impose on taverns who violate this law strict civil liability for the acts of persons who became intoxicated from drinking their own alcohol on the tavern premises.

170 Md.App. at 127, 906 A.2d 1028 (emphasis supplied).

Every violation of a liquor license does not operate to impose general liability. Logical relevance is still required to establish the necessary cause and effect.

*To impose liability* on the New York Palace *because it violated this statute would create* dram · shop *liability through the back door* of a liquor license violation. This we will not do.

170 Md.App. at 128, 906 A.2d 1028 (emphasis supplied). The case was another negative example.

In *Fisher v. O'Connor's, Inc.,* 53 Md.App. 338, 452 A.2d 1313 (1982), Chief Judge Gilbert recognized the general principle, but also observed that its applicability had been traditionally appropriate in cases involving motor vehicle torts. That observation about both the provenance and the utility of the principle was an epiphany in terms of our understanding of it.

Maryland has consistently held that *a violation of a statutory regulation is evidence of negligence,* and if the "violation causes or contributes to the injuries complained of, it constitutes negligence."

> *Each of the cited cases in which that principle of law is iterated involved a motor vehicle tort. Patently, violation of a statute concerning the "rules of the road" may be evidence of negligence,* and if the violation caused or contributed to the injuries, it constitutes negligence. *Alston v. Forsythe,* 226 Md. at 130, 172 A.2d 474. *The precept of law that "violation of a statute is evidence of negligence" is a rule of evidence, not the creation of a substantive cause of action.*

53 Md.App. at 341–42, 452 A.2d 1313 (emphasis supplied).

As Judge Gilbert went on to point out, the violation of a statute does not *ipso facto* create a civil cause of action. Only an act of the Legislature can do that. The case before the Court was not a motor vehicle tort and the evidentiary principle was held not to apply.

> Thus, *if a cause of action may be brought against a bar or tavern owner* by a patron who is injured as a result of his own intoxication, *that cause must arise from an act of the Legislature.*

The only statute of the General Assembly concerning the sale of alcoholic beverage to intoxicated persons is codified as Md. Ann.Code art. 2B, § 118. *Although that act declares it to be a misdemeanor to sell alcoholic beverages to an intoxicated person, it does not create a civil cause of action* against the bar or tavern owner. Absent an act of the Legislature sanctioning, under circumstances similar to those of the matter *sub judice,* a civil suit against bar or tavern owners, there is no liability for injuries to intoxicated patrons. We are cognizant that there is an aberration in the law in that *the bar or tavern owner may be fined or jailed or both,* for serving alcoholic beverages to an intoxicated patron, *but the owner may not be sued.*

The Court of Appeals has made crystal clear in *Felder* and *Hatfield* that *if a civil cause of action is to be permitted* against a bar or tavern owner for injuries to third parties caused by the intoxicated patrons of those bars or taverns, *it is for the Legislature, not the Courts, to create the legal remedy.*

53 Md.App. at 342–43, 452 A.2d 1313 (emphasis supplied). It was yet another negative example.

*Atlantic Mutual Insurance Co. v. Kenney,* 323 Md. 116, 124, 591 A.2d 507 (1991), by contrast, was a motor vehicle tort case in which the evidentiary principle was appropriately utilized.

In *Pahanish v. Western Trails, Inc.,* 69 Md.App. 342, 517 A.2d 1122 (1986), the plaintiff's negligence case was ruled to be inadequate as a matter of law because "the evidence failed to demonstrate appellee knew or should have known of any mischievous propensity on the part of the horses involved in the incident." 69 Md.App. at 349, 517 A.2d 1122. The plaintiff there, as the appellant here, sought to avoid that foreclosing effect of no notice by invoking an unquestioned violation of the licensing and inspection provisions by the defendant to establish a *prima facie* case of negligence.

*Appellant's next contention* of error *is that the lower court erred in failing to find that the violation by appellee of certain statutory licensing and inspection provisions established a prima facie case of negligence* on appellee's part.

In Maryland, the violation of a statute does not constitute negligence *per se.* Rather, *the breach of a statutory duty may be considered some evidence of negligence where three requirements are met.* First, the plaintiff must be a member of the class of persons the statute was designed to protect. Second, the injury suffered must be of the type the statute was designed to prevent. Third, the plaintiff must present legally sufficient evidence to demonstrate that the statutory violation was the proximate cause of the injury sustained.

The testimony establishes that *appellee was not licensed or inspected* in the year in question, *in breach of its duty* under sections 2–710 and 2–713 of the Maryland Agriculture Code Annotated.

69 Md.App. at 361–62, 517 A.2d 1122 (emphasis supplied). For the absence of a causal link, however, the plaintiff's effort failed.

Appellant, however, has provided no circumstantial or direct evidence which would establish a causal link between the breach by appellee of his statutory duty and the injury actually sustained by appellant.

69 Md.App. at 363, 517 A.2d 1122. It was, once again, a negative example.

Except for *Atlantic Mutual Ins. Co. v. Kenney, supra,* which was a motor vehicle tort case, every one of the cases we have cited and discussed has reiterated the general principle that, *under some circumstances,* the violation of a statute or regulation may constitute evidence of negligence. In not one of the cases, however, was the statutory violation actually accepted as evidence of negligence. Success, after invoking the general rule, is by no means automatic. The statement of this legal principle, the caselaw unmistakably tells us, is not an absolute statement, but only a contingent one. Before a plaintiff reaches the shelter of a statutory violation as evidence of negligence, he must successfully run the gauntlet of "in some circumstances." Many an aspiring candidate fails to do so successfully.

### Legislative Impact On the Standard of Conduct

As we approach our examination of the Montgomery County ordinance on which the appellant relies, it is appropriate to set the stage. Helpful in that regard is *Restatement, Second, Torts* (1965), §§ 285, 286, 288 and 288B. Section 285 sets out the various ways in which the standard of conduct of a reasonable man may be determined.

*The standard of conduct of a reasonable man may be*

(a) established by a legislative enactment or administrative regulation which so provides, or

(b) *adopted by the court from a legislative enactment or an administrative regulation which does not so provide,* or

(c) established by judicial decision, or

(d) applied to the facts of the case by the trial judge or the jury, if there is no such enactment, regulation, or decision.

(Emphasis supplied).

In all of our discussion in this opinion, it will be the second of those modalities that is pertinent. With respect to that modality, the Comment to the *Restatement* observed:

*Even where a legislative enactment contains no express provision that its violation shall result in tort liability,* and no implication to that effect, *the court may,* and in certain types of cases customarily will, *adopt the requirements of the enactment as the standard of conduct necessary to avoid liability* for negligence. The same is true of municipal ordinances and administrative regulations.

*Id.* at § 285, p. 21 (emphasis supplied).

Dan B. Dobbs, *Law of Torts,* (2001), § 133, "Effects of Statutes in Tort Law," p. 311, also describes this sort of statute or regulation.

*[C]ourts may* usually *accept the statutory rule of conduct as a judicial rule for tort cases,* even though the statute itself does not require it. In other words, courts are free to accept, reject, or modify the rule as applied in tort law, so long as the statute does not state or imply to the contrary.

(Emphasis supplied).

*Dobbs,* § 134, "General Rules for Applying Statutes as Tort Standards," p. 315, further describes this phenomenon in which the courts adopt the requirements of a nonprescriptive statute or regulation as setting the standard for judging negligence.

Although some statutes expressly create a tort claim or establish some special rule for tort cases, *a very large*

*number of statutes provide only* a criminal penalty or *some form of administrative enforcement. These statutes prescribe nothing at all about tort law, so they can be identified here as nonprescriptive statutes.* Although such statutes prescribe no tort-law effects at all, *courts are* usually *free* nonetheless *to adopt the standards or rules of conduct from such statutes and to apply them to tort cases.* For instance, a statute may forbid driving at a speed in excess of a posted limit and may impose a criminal penalty only; but *courts are nevertheless likely to use that speed limit as a standard for judging negligence.*

(Emphasis supplied).

When a statute or regulation is deemed to be appropriate for setting a standard of care, there are two modalities by which a violation of the statute or regulation is applied to the trial of a tort case. The majority of state courts treat the violation as negligence *per se.* Maryland is among the minority of states that treat the violation simply as evidence of negligence. *Dobbs,* § 134, p. 317, describes this evidentiary rule:

(b) *Evidence of negligence. A few courts reject the per se rule and treat violation as merely some evidence of negligence* or as "guidelines for civil liability." This rule permits the jury to conclude that a statute violator behaved in a reasonable way even if he presents no particular excuse.

. . . .

*The evidence of negligence rule is flexible and easy to administer.* It does not generate litigation over excuses.

(Emphasis supplied).

Section 286 of *Restatement, Second* then sets out the prerequisites that typically must be satisfied before a statute or regulation will be deemed to determine the standard of conduct imposed on a defendant.

When Standard of Conduct Defined by Legislation or Regulation Will Be Adopted

*The court may adopt as the standard of conduct of a reasonable man the requirements of a legislative enactment*

*or an administrative regulation whose purpose is found to be* exclusively or in part

(a) *to protect a class of persons* which includes the one whose interest is invaded, and

(b) *to protect the particular interest* which is invaded, and

(c) *to protect* that interest *against the kind of harm which has resulted,* and

(d) *to protect* that interest *against the particular hazard from which the harm results.*

(Emphasis supplied).

When a statute or regulation does satisfy the requirements of § 286, a violation may bring into play the evidentiary rule as it has been regularly expressed in the Maryland caselaw. Section 288B(2) explains:

The unexcused violation of an enactment or regulation . . . may be relevant evidence bearing on the issue of negligent conduct.

Section 288 is the corollary of § 286, as it sets out the circumstances in which a statute or regulation will *not* be deemed to establish the controlling standard of conduct. The Montgomery County ordinance on which the appellant relies is a paradigmatic example of a statute or regulation that is thus immaterial to the negligence case at hand.

### The Montgomery County Code On Landlord–Tenant Relations

Section 288 of *Restatement, Second* sets the bar that the Montgomery County ordinance in question must clear.

*The court will not adopt* as the standard of conduct of a reasonable man *the requirements of a legislative enactment or an administrative regulation whose purpose is found to be exclusively*

(a) to protect the interests of the state or any subdivision of it as such, or

(b) *to secure to individuals the enjoyment of rights or privileges to which they are entitled only as members or the public,* or

(c) to impose upon the actor the performance of a service which the state or any subdivision of it undertakes to give the public, or

(d) *to protect a class of persons other than the one whose interests are invaded,* or

(e) *to protect another interest than the one invaded,* or

(f) *to protect against other harm than that which has resulted,* or

(g) *to protect against any other hazards than that from which the harm has resulted.*

(Emphasis supplied).

*Dobbs,* § 135, "Adopting or Rejecting the Statutory Standard," p. 320, also made reference to those types of statutes or regulations that are inherently not intended to establish a special standard of care for tort cases.

Several groups of nonprescriptive statutes are often regarded as unsuitable for use in tort cases. First, *courts usually refuse to adopt statutory standards that were not aimed at protecting groups that included the plaintiff and those not aimed at protecting against harms of the kind suffered by the plaintiff.*

(Emphasis supplied).

The champion on which the appellant pins his hopes in this case is § 29–30(a)(2) of the Montgomery County Code. It is a frail candidate to take up so daunting a challenge. The section provides:

(a) Each landlord must reasonably provide for the maintenance of the health, safety, and welfare of all tenants and all individuals properly on the premises of rental housing. As part of this obligation, *each landlord must:*

(2) *Keep all areas of the building, grounds, facilities, and appurtenances in a clean, sanitary, and safe condition.* (Emphasis supplied).

■ That is, in the first place, a provision so innocuously boiler-plate as to be a platitude. It is, at most, no more than a restatement of the long prevailing common law rule in Maryland that a landlord has a duty to keep the common areas of a building in a clean and safe condition. *Rawls v. Hochschild, Kohn & Co.*, 207 Md. at 117, 113 A.2d 405 ("It is the law in Maryland ... that the proprietor of a store owes a duty to ... [an invitee] to exercise ordinary care to keep the premises in a reasonably safe condition and will be liable for injuries sustained as a consequence of a failure to do so.").

Section 29–30(a)(2) did not "create a legally cognizable duty running from [the appellees] to all [invitees]" or create "a tort duty," as described by *Erie Insurance v. Chops*, 322 Md. at 86, 585 A.2d 232. It was not a statute designed "to create a legal duty," as contemplated by *Veytsman v. New York Palace*, 170 Md.App. at 127, 906 A.2d 1028. It does not constitute "the creation of a substantive cause of action," as stated in *Fisher v. O'Connor's*, 53 Md.App. at 342, 452 A.2d 1313. Section 29–30(a)(2) was not enacted for the benefit of the appellant as "a member of the class of persons the statute was designed to protect," as that requirement was described by *Pahanish v. Western Trails, Inc.*, 69 Md.App. at 361–62, 517 A.2d 1122.

If § 29–30(a)(2) is not any of these things, what then is it? It would have been hard to tell from the appellant's brief, for an isolated passage or two from the Montgomery County Code, out of context, could easily have led us to conclude that § 29–30(a)(2) packs more punch for present purposes than it actually does. An overview of Chapter 29, however, presents a more revealing picture.

The subject matter of Chapter 29 of the Montgomery County Code is made clear in its title: "Landlord–Tenant Relations." The express purpose of the chapter is to make the contractual relationships between landlord and tenant more arm's length and amicable by removing as many areas of doubt or ambiguity as possible and by providing a specially

designed tribunal to reconcile any differences between them. Section 29–2 set out the "Legislative Findings" that prompted the enactment of Chapter 29.

The County Council finds that *there is often an unequal bargaining power between landlords and tenants;* that *the common law principles under which leases are interpreted* as grants of right of possession rather than mutual and dependent covenants evolved in an agricultural setting and *are ill-suited to the modern residential setting of this urban county;* that, in order to facilitate fair and equitable arrangements, foster the development of housing that will meet the minimum standards of the present day and promote the health, safety and welfare of the people, *it is necessary* and appropriate *that the County appoint a commission* and assign responsibilities to the Department *to determine certain minimal rights and remedies, obligations and prohibitions, for landlords and tenants of certain kinds of residential property.*

(Emphasis supplied).

Chapter 29 was not remotely designed to create a cause of action in tort for the protection of invitees. If the "Legislative Findings" of § 29–2 left any doubt in this regard, the "Purposes and Policies" spelled out in § 29–3(b) should provide the interpretive *coup de grace.*

(b) *The underlying purposes and policies of this Chapter are:*

(1) To simplify and *clarify the law governing the rental of dwelling units.*

(2) To encourage landlords and tenants to maintain and improve the quality of housing in this county.

(3) To *assure* fair and *equitable relations between landlords and tenants.*

(4) *To revise and modernize the law of landlord and tenant* to serve more realistically the needs of an urban society developing in this County.

(Emphasis supplied).

Section 29–4 then set out the "Applicability of the Chapter."

> Subject to State law, *this Chapter* regulates and *determines the legal rights, remedies and obligations* of the parties and beneficiaries *of any rental agreement concerning any rental dwelling unit* located in the County.

(Emphasis supplied)

To resolve any disputes or misunderstandings between the landlord and the tenant, Article II of Chapter 29 establishes a complete procedural apparatus for adjudicating, conciliating, and resolving tenants' complaints about the landlord (§ 29–36) or landlords' complaints about the tenant (§ 29–37).

Section 29–39 makes it clear that, after a complaint is filed by either a landlord or a tenant, the complaint will be investigated by the Director of the Department of Housing and Community Affairs. If the Director finds that a violation of any provision of Chapter 29 has occurred, §§ 29–41, 29–42, and 29–43 deal with the efforts that the Director should make in an effort to conciliate any dispute between landlord and tenant. If conciliation fails, §§ 29–44 through 29–47 provide for a hearing before the Commission itself.

Section 29–30, on which the appellant relies, is part of Article IV of Chapter 29, dealing with "Landlord–Tenant Obligations." Section 29–29 lists the various "Obligations of tenants" to the landlord, just as § 29–30 lists the "Obligations of landlords" to the tenant. The character of subsection (a)(2), as part and parcel of the rental contract, is in part revealed by the other items in the catalog of obligations of the landlord. They include such things as the obligation "to make all repairs," to "maintain all electrical, plumbing and other facilities and conveniences," "to supply and maintain appropriate receptacles to remove trash," and "to supply water, and hot water ... and adequate heat." These are contractual obligations under the lease, not the establishment of tort liability.

In *County Council for Montgomery County v. Investors Funding Corp.*, 270 Md. 403, 312 A.2d 225 (1973), the Court of Appeals, speaking through Chief Judge Robert C. Murphy, thoroughly analyzed the chapter of the Montgomery County

Code on which the appellant now relies.[1] Judge Murphy characterized the chapter as an undertaking by the county "to comprehensively regulate the apartment rental business and its concomitant landlord-tenant relationship and activities in Montgomery County." 270 Md. at 406, 312 A.2d 225. The Court of Appeals quoted from the "Legislative Findings" and the "Purposes and Policies" sections of the chapter, 270 Md. at 406–07, 312 A.2d 225, just as we have done. After thoroughly reviewing the provisions for establishing and staffing the Commission and the procedures for resolving either landlord or tenant grievances, 270 Md. at 407–11, 312 A.2d 225, the Court of Appeals placed its imprimatur on the chapter, holding that "the [Montgomery County] Council was empowered to enact local legislation regulatory of the apartment rental business and landlord-tenant relationships in Montgomery County." 270 Md. at 415, 312 A.2d 225.

It could not be more clear that Chapter 29 generally, and § 29–30(a)(2) specifically, of the Montgomery County Code did not create a civil action in tort for the benefit of invitees in slip–and–fall cases. The appellant's attempt to invoke it gets absolutely nowhere.

### A Slip–and–Fall Is Not *Res Ipsa Loquitur*

The appellant's effort to predicate a *prima facie* case of negligence on a violation of § 29–30(a)(2) fails for yet another and independent reason. Even if, *arguendo*, Chapter 29 of the Montgomery County Code were throbbing with tort law vitality, the appellant has proffered nothing to show a violation of § 29–30(a)(2). The section, even if *arguendo* it resonated in tort law, would not be the occasion for invoking an instance of *res ipsa loquitur*, which is precisely the effect for which the appellant necessarily argues. The slip-and-fall itself would not *per se* prove a violation of § 29–30(a)(2) any more than it would *per se* establish the appellees' negligence.

---

1. It was enacted on June 13, 1972 and was originally codified as Chapter 93A. A recodification of the Montgomery County Code later in 1972 switched its designation in the Code to Chapter 29, where it now resides essentially unchanged since its initial enactment.

In a slip-and-fall case, such as this, the negligence, if any, would lie in the fact that the appellees, with actual or constructive knowledge of the hazardous condition on the stairs, failed to take timely and reasonable steps to abate the hazard. Even if, *arguendo,* a violation of § 29–30(a)(2) were the proper predicate for a civil action in tort, the proof of a violation of the section would require, at the very least, a showing that reasonable inspections had not been conducted to check for the existence of such hazards. No such showing was so much as suggested in this case.

### The Overarching Significance Of "In Some Circumstances"

We revert for a moment to the principle that a statutory or regulatory infraction is in some circumstances, but not always, evidence of negligence. That disembodied principle should never be taken out of context and arbitrarily applied. There is a generative reason behind the rule. When the reason for the rule is served, the application of the rule makes perfect sense. When the reason for the rule is not served, however, its blind application is an affirmative mischief. Restricting the principle to its proper use is the function of the qualifying words "in some circumstances."

Judge Gilbert's epiphany, in *Fisher v. O'Connor's,* 53 Md. App. at 341–42, 452 A.2d 1313, about the rule's seedbed having been motor vehicle tort law helps us to get a grasp on those "circumstances" that are conducive to the application of the rule and those that are not. The principle, vital and valuable as it may be in the context of motor vehicle tort law, frequently does not thrive when transplanted to other varieties of negligence. It is a principle that is completely misplaced in the context of slip-and-fall negligence.

In the world of motor vehicle negligence, the very conduct that is the gravamen of the traffic law violation—speeding, driving under the influence, driving without lights, driving the wrong way down the one-way street—is largely, if not entirely, also the core conduct, assuming causation, for proving negligence. Generally speaking, the illegal conduct is *ipso*

*facto* the negligent conduct. There is no intermediate step that is required to connect the two. The behavior of the tortfeasor simultaneously both breaks the law and creates the tort hazard. The proof of one consequence helps to prove the other consequence.

In slip-and-fall cases, by contrast, there is no such simple and immediate identity of the effects of the sub-standard behavior. Generally speaking, it is not the defendant land-owner who has created the wet spot or dropped the grape on the floor. The wet spot or the grape, albeit hazards, are not in themselves evidence of negligence—absent something more. That something more, the necessary second step in the process, is the failure of the landowner reasonably to abate the hazard, once having acquired actual or constructive knowledge of it. Without that incremental step, an additional step not required in the motor vehicle tort cases, there can be no negligence, to wit, no breach of the duty of reasonable care.

There also could be no violation of § 29–30(a)(2) of the Montgomery County Code, even if, *arguendo*, it were other-wise pertinent. It is the absence of the intermediate step that makes the legal principle under discussion frequently appro-priate in the typical case of motor vehicle negligence. By violating the law, the tortfeasor has already done everything necessary to commit the tort. It is the presence of this intermediate step, on the other hand, that makes the principle generally inapplicable to slip–and–fall cases.

It is a truism that a violation of a statute or regulation cannot operate to excuse a knowledge requirement if proof of the violation itself requires the satisfaction of the knowledge requirement. If the plaintiff must prove at the front end of his thesis the very thing he seeks to be exempted from proving at the tail end of his thesis, the argument is gibberish.

### The Anti–Lead–Paint Regulations: Landlord Knowledge Is Not a Factor

Depending, of course, upon the force and focus of the regulations seeking to control a clearly identified and recur-

ring hazard, a lead-paint case, unlike a slip-and-fall case, is a perfect setting for an application of the principle that a violation of the regulation may *ipso facto* be evidence of landowner negligence. The controlling regulation, moreover, may readily be one from which knowledge has been eliminated as a prerequisite for a violation.

In *Brooks v. Lewin*, the very specific prohibitions against allowing the existence of flaking and peeling paint on the leased premises were violated. The violations were *faits accompli*, without any necessity of showing actual knowledge on the part of the landlord. In the anti-flaking-paint provisions of the Baltimore City Code, knowledge of the hazardous condition has essentially been eliminated as a required element for a violation. No such elimination of knowledge by the landowner as a factor has ever occurred, or realistically could occur, in the totally different circumstances of slip-and-fall cases.

The impact of *Brooks v. Lewin* on the notice or knowledge requirement was best summarized by Judge Raker in her dissent.

> The majority . . . holds that by enacting the Baltimore City Housing Code, the City Council intended to abolish the element of notice in a common law negligence action for injuries resulting from flaking, loose or peeling paint.

378 Md. at 90, 835 A.2d 616. By contrast, the Montgomery County Council, in enacting Chapter 29 of the County Code, evidenced no such intent "to abolish the element of notice" in slip-and-fall cases.

The majority opinion was explicit about the very specific problem that the Housing Code was addressing.

> *The removal of flaking, loose, or peeling paint is mandated in two separate sections of the Housing Code* in order for a dwelling to be deemed in "good repair" or "safe condition." First, *§ 703 provides*, in relevant part as follows:
>
> . . . .

(3) *All walls, ceilings, woodwork, doors and windows shall be kept clean and free of any flaking, loose, or peeling paint.*

Next, *§ 706(b) mandates the removal of loose and peeling paint* from interior walls and *requires that any new paint* applied to the interior surfaces *be free of lead:*

\* \* \*

(b) *Interiors.*

(1) All interior *loose or peeling wall covering or paint shall be removed* and the exposed surface shall be placed in a smooth and sanitary condition.

(2) *No paint shall be used* for interior painting of any dwelling ... *unless the paint is free from any lead pigment.*

378 Md. at 82–83, 835 A.2d 616 (emphasis supplied). The Court of Appeals referred to those Code provisions as "a comprehensive statutory scheme." 378 Md. at 81, 835 A.2d 616.

The legal effect of statutory requirements of this type, imposed on landlords by the Baltimore City Code, is described by *Dobbs,* § 133, "Effects of Statutes in Tort Law," pp. 311–12:

*One kind of statute imposes a specific duty or a standard of care* that would not exist at common law but does not otherwise change the rules for negligence, causation, defenses, and procedures. For instance, *statutes may require owners to post a lifeguard* at certain swimming pools, require landowners *to cut weeds to enhance visibility* at an intersection, or require landlords *to equip premises with secure locks* as protection against intruders. *If a plaintiff is harmed by violation of such a statute,* courts think of the plaintiff's case as an ordinary negligence case with the same issues and rules as other negligence cases except that the *plaintiff proves negligence by proving violation of the statute.* But because it is an ordinary negligence case, the

plaintiff must also prove causation and damages, and she will lose if she fails to do so.

(Emphasis supplied).

*Brown v. Dermer*, 357 Md. 344, 744 A.2d 47 (2000), had also reviewed those same provisions of the Baltimore City Code. It concluded that for a landlord to lease a dwelling that contained "flaking, loose or peeling paint" was a violation of the Code provisions *per se.* Unlike the breach of a landowner's duty of care in a slip-and-fall situation, the Code violations were *faits accompli* without any requirement that the landlord be aware of the violation.

> From the foregoing, it is clear that *it is unlawful to lease a dwelling with flaking, loose or peeling paint* and that no premises are to be leased for human habitation, except those that are fit for human habitation, *i.e.,* those that are kept in good repair and safe condition as defined in the Baltimore City Code. To be sure, § 706 prohibits the use of lead-based paint for interior painting in a dwelling unit; however, neither it nor §§ 702 and 703 limits the prohibition of flaking, loose or peeling paint to lead-based paint. *To be a violation, all that must be shown is that there was flaking, loose or peeling paint,* without any further showing as to the content of the paint.

357 Md. at 361, 744 A.2d 47 (emphasis supplied).

*Brooks v. Lewin,* 378 Md. at 80, 835 A.2d 616, emphatically stated that a landlord's knowledge of the existence of flaking or peeling paint is not a requirement for the proof of negligence.

> [O]nce it is established that there was a statutory violation, *the tort defendant's knowledge that he or she violated the statute is not part of the tort plaintiff's burden of proof. It is the violation* of the statute or ordinance *alone which is evidence of negligence.*

(Emphasis supplied).

In Baltimore City at least, there can be a violation of the pertinent regulation without any knowledge on the part of the landowner in a lead-paint case. In a slip-and-fall case, there

may not. That is one reason why the two types of cases are not at all comparable.

### Brooks v. Lewin Is Sui Generis

For quite a separate reason, *Brooks v. Lewin* could not be deemed to have worked any sweeping changes in negligence law generally. *Brooks v. Lewin* is *sui generis,* dealing exclusively with heightened landlord responsibility in Baltimore City for injuries to children caused by loose and flaking lead paint. The decision was an *ad hoc* solution to a unique social problem and does not purport to have any far-flung implications beyond that limited context.

At the outset of the opinion, the five-judge majority carefully circumscribed the context within which the change in the law that it then announced would operate.

> *We granted* a petition for a writ of *certiorari* in this case *to clarify the notice requirement in lead paint poisoning negligence actions based upon violations of the Baltimore City Housing Code.* We shall hold that, *in the context of a tort action against a Baltimore City landlord, based upon a child's consumption of lead-based paint* which was present *in the form of flaking, loose, or peeling paint* in the leased premises, in violation of the Housing Code, the plaintiff does not have to show that the landlord had notice of the violation to establish a *prima facie* case.

378 Md. at 72, 835 A.2d 616 (emphasis supplied).

After certiorari had been granted in *Brooks v. Lewin* and after oral argument of the case had initially been heard, the Court of Appeals issued an order directing the parties to file supplemental briefs and setting the case for reargument on a precise question "not previously dealt with by the parties or the courts below." 378 Md. at 75, 835 A.2d 616. The limited nature of the new inquiry was made very clear.

> The order for supplemental briefs and reargument pointed out that *language in Richwind v. Brunson and Brown v. Dermer requires,* for landlord liability in a case like the one at bar, *that the plaintiff has the burden of pleading and*

*proving that the landlord knew or had reason to know of* the defective condition, *i.e., the existence of flaking, loose, or peeling paint.* ... The order requested the parties "to address *whether this Court should reconsider* and modify the above-[described] *requirements and standards applicable in personal injury actions against landlords based on alleged lead-based paint poisoning* in leased residential property."

*Id.* (emphasis supplied).

The order directed the parties to address three specific sub-issues.

"1. *Whether a landlord should have a duty* to inspect the premises, either at the inception of the lease or during the lease period, *to determine whether there exists a flaking, loose, or peeling paint condition,* or a lead-based paint condition, which should be abated;

"2. *Whether plaintiffs* in these types of actions *should have the burden of* pleading and *establishing that the landlords had notice of* a defective condition involving *flaking, loose or peeling paint, or the presence of lead-based paint;*

"3. *Whether, when there is a dangerous lead-based paint condition* in leased residential property, *the landlord should,* as a matter of law, *be presumed to have notice of the dangerous condition."*

378 Md. at 75–76, 835 A.2d 616 (emphasis supplied).

Judge Eldridge's opinion first pointed out that ordinarily there is no duty on a landlord to keep rental premises in repair.

[U]nder the common law and in the absence of a statute, *a landlord ordinarily has no duty to keep rental premises in repair, or to inspect the rental premises either at the inception of the lease or during the lease term.*

378 Md. at 78, 835 A.2d 616 (emphasis supplied). The opinion then noted an "exception to this general rule ... where there

is an applicable statutory scheme designed to protect a class of persons which includes the plaintiffs." *Id.*

The identification of children especially in low-cost rental properties in Baltimore City as the "class of persons" which the Baltimore Housing Code "was designed to protect" was expressly articulated.

> *The plaintiffs are obviously within a class of persons which the Housing Code was designed to protect.* "Patently, by enacting §§ 702 and 703 of the Housing Code, *the City Council sought to protect children from lead paint poisoning* by putting landlords on notice of conditions which could enhance the risk of such injuries".

378 Md. at 81, 835 A.2d 616 (emphasis supplied).[2]

The Court of Appeals disclaimed any imposition of strict liability on landlords and further pointed out the unusual characteristics of defects in a premises based on the presence of lead paint.

> *[O]ur holding* in the instant case *does not impose a strict liability regime upon landlords.* Whether Lewin Realty is held liable for an injury to a child, based on lead paint poisoning, will depend on the jury's evaluation of the reasonableness of Lewin Realty's actions under all the circumstances.
>
> ... *The respondent's concerns that a landlord will be required to "inspect[ ] the property every day, three times a week, twice a week, twice a month, once a month ..." are without basis.* The nature of the defective condition in

---

2. *Brown v. Dermer,* 357 Md. 344, 367–68, 744 A.2d 47 (2000), unequivocally identified children as the class of persons the Baltimore City Housing Code was designed to protect.

As far back as the early 1930s *childhood lead paint poisoning was a problem in the City of Baltimore* and, in 1966, *the City Council addressed this problem by enacting the provisions discussed herein.*[9]

[9] The legislative history of the housing code shows that *§§ 703 and 706 were written to prevent childhood lead poisoning.* ... It is evident from the exclusion of language referring to the type of paint and the historical context in which the housing code was written that *these provisions were aimed at preventing childhood lead poisoning.* (Emphasis supplied).

question—*a flaking, loose, or peeling paint condition—is a slow, prolonged process which is easily detected in the course of reasonable periodic inspections.* As the respondent concedes, "[w]e know that paint in a property will chip—it is just a matter of time." *It does not occur overnight.*

378 Md. at 84–85, 835 A.2d 616 (emphasis supplied).

The final holding of the Court of Appeals left no doubt that that case was a lead paint case and nothing but a lead paint case, dealing with the "presence of flaking, loose, or peeling paint" and designed to "prevent lead poisoning in children."

In sum, *the presence of flaking, loose, or peeling paint is a violation of the Housing Code. Brown v. Dermer* ("To be a violation, *all that must be shown is that there was flaking, loose or peeling paint* "). As earlier pointed out, *certain provisions of the Housing Code were clearly enacted to prevent lead poisoning in children.* Therefore, *the plaintiff* Sean *is in the class of people intended to be protected* by the Housing Code, and his injury, *lead poisoning, is the kind of injury intended to be prevented by the Code.*

378 Md. at 89, 835 A.2d 616 (emphasis supplied).

Whatever was said in that very limited, if not indeed unique, context of *Brooks v. Lewin* has absolutely nothing to do with the slip-and-fall case now before us. The limitation is self-evident for a number of reasons.

### *Brooks v. Lewin* Did Not Overrule 70 Years Of "Slip–and–Fall" Caselaw *Sub Silentio*

The actual or constructive knowledge of a hazardous condition as a requirement for liability by a landlord was first recognized by Maryland law in 1936 by *Moore v. American Stores,* 169 Md. 541, 550–51, 182 A. 436, as it held that a landowner owes

*a duty to exercise reasonable and ordinary care to see that its premises were in such a condition that its customers might safely use them* while visiting the store upon its invitation to buy its wares. . . . In the performance of that

duty *it [is] required to exercise reasonable care to discover conditions which,* if known to it, it should have realized *involved an unreasonable risk* to such patrons ... *Any breach of that duty* resulting in injury to one lawfully on its premises as an invitee *would constitute negligence, if, but only if, it knew, or by the exercise of reasonable care could have discovered, + the conditions which created the peril,* and had no reason to believe that its invitees would realize the risk involved therein.

(Emphasis supplied).

In the intervening 70 years, that unchallenged principle of law has regularly been repeated, applied, and amplified on occasions too numerous to catalog. It is the prevailing and universally recognized law of this State.

The carefully researched and cautiously worded opinion in *Brooks v. Lewin* acknowledged that it was inconsistent with much of the analysis in *Richwind v. Brunson,* 335 Md. 661, 645 A.2d 1147 (1994), and *Brown v. Dermer,* 357 Md. 344, 744 A.2d 47 (2000), and expressly held that, to the extent those opinions "are inconsistent with this holding, those opinions are modified or overruled." 378 Md. at 72, 835 A.2d 616. It is inconceivable that the opinion, otherwise so upfront about its impact on existing law, would have presumed to overrule 70 years of well established Maryland law without so much as mentioning the fact and without giving any reasons for so tectonic a shift. If the Court, *sub silentio,* had undertaken to do any such thing, it is equally inconceivable that the close scrutiny of dissenting Judges Raker and Wilner would have failed to notice or comment upon so seismic an upheaval. Doctrinal earthquakes simply do not occur *sub silentio,* and none occurred in that case.

If *Brooks v. Lewin* had changed the law in the fashion argued by the appellant, moreover, it would be exceedingly difficult to reconcile such a change with the unanimous opinion of the Court in *Deering Woods Condominium Association v. Spoon,* 377 Md. 250, 833 A.2d 17 (2003). The *Deering Woods* opinion had been filed on October 6, 2003, just five weeks

before *Brooks v. Lewin* was filed and seventeen months after *Brooks v. Lewin* had been reargued on May 7, 2002. In Deering Woods, the opinion of Judge Rodowsky for a unanimous Court nonchalantly reaffirmed, in a slip-and-fall case, the traditional knowledge requirement. The decision in *Brooks v. Lewin*, even if not the final draft of the opinion, would already have been thoroughly discussed and thoroughly debated by the time that the *Deering Woods* opinion was finally approved, a few days before its October 6, 2003 filing. The *Deering Woods* Court would hardly have quietly reaffirmed a principle that it was preparing to overturn within the month. That is not the way things happen in the appellate world.

### The Holdings of This Court That Slip–and–Fall Law Has Not Changed

If any further exclamation point were required to stress this immutability, this Court added two of them in *Rehn v. Westfield America*, 153 Md.App. 586, 837 A.2d 981 (2003), *cert. denied*, 380 Md. 619, 846 A.2d 402 (2004), and *Maans v. Giant of Maryland*, 161 Md.App. 620, 871 A.2d 627, *cert. denied*, 388 Md. 98, 879 A.2d 43 (2005). Both were slip-and-fall cases. Both reaffirmed the knowledge requirement before a landowner can be held liable for a breach of duty. Both were post-*Brooks v. Lewin* decisions.

 The opinion of Judge Adkins in the *Rehn* case was filed on December 8, 2003, one month after *Brooks v. Lewin* was filed. Judge Adkins stated, 153 Md.App. at 593, 837 A.2d 981, the prevailing law as to actual or constructive knowledge on the part of the landowner.

When another patron creates the danger, *the proprietor may be liable if it has actual notice and sufficient opportunity to either correct the problem or warn its other customers about it. The evidence must show* not only that a dangerous condition existed, but also *that the proprietor "had actual or constructive knowledge* of it, and that that knowledge was gained in sufficient time to give the owner the opportunity to remove it or to warn the invitee."

Whether there has been sufficient time for a business proprietor to discover, cure, or clean up a dangerous condition depends on the circumstances surrounding the fall. " 'What will amount to sufficient time depends upon the circumstances of the particular case, and involves consideration of the nature of the danger, the number of persons likely to be affected by it, the diligence required to discover or prevent it, opportunities and means of knowledge, the foresight which a person of ordinary care and prudence would be expected to exercise under the circumstances, and the foreseeable consequences of the conditions.' "

(Emphasis supplied). Nothing had changed.

The opinion of Judge Salmon in the *Maans* case was filed on April 4, 2005, seventeen months after *Brooks v. Lewin* was filed:

A store operator, such as Giant, is not the insurer of the invitee's safety. *Moulden v. Greenbelt Consumer Servs., Inc.,* 239 Md. 229, 232, 210 A.2d 724 (1965). In addition, *"the burden is upon the customer to show that the proprietor created the dangerous condition or had actual or constructive knowledge of its existence" prior to the invitee's injury.*

161 Md.App. at 627–28, 871 A.2d 627 (emphasis supplied). Again, nothing had changed.

Both the *Rehn* opinion and the *Maans* opinion traced the unbroken Maryland law back to *Moore v. American Stores* in 1936. Both opinions quoted from and relied upon *Deering Woods v. Spoon* (October 6, 2003). Neither opinion so much as mentioned *Brooks v. Lewin* or suggested that it might have any pertinence at all to a slip-and-fall case. We hold that it has no pertinence.

### The Motion to Dismiss

██ The appellees have moved to have the appeal dismissed because of the failure of the appellant to prepare a transcript of the hearing on the summary judgment motions, as required by Maryland Rule 8-411(c). The appellant did

not, moreover, confer with or obtain any agreement from the appellees as to what would be filed. Rule 8–411(a). A dismissal of the appeal would be justifiable pursuant to Rule 8–602(a)(6) and (8).

We are fully sympathetic with the complaints of the appellees in this case. By their own diligence, however, they have supplied much of the material that makes it possible for us to reach a decision on the merits of the case, which, when possible, is always a preferred alternative. We are guided in that regard by the opinion of Judge Moore for this Court in *Kemp–Pontiac–Cadillac, Inc. v. S & M Construction Co.*, 33 Md.App. 516, 524, 365 A.2d 1021 (1976).

In the decisions of the Court of Appeals and of this Court, above cited, it is well settled that *the decision to grant or deny a motion to dismiss is discretionary with the appellate court.* Furthermore, *if the appellee elects to supply in his record extract the material omitted by the appellant,* instead of exercising the option of filing a motion to dismiss and requesting that the time for filing his brief be extended, *the appellate court would not ordinarily dismiss the appeal, in the absence of prejudice to appellee* or a deliberate violation of the rule. *It would instead impose the cost of printing the omitted material on the appellant,* regardless of the outcome of the case.

(Emphasis supplied).

Accordingly, we deny the motion to dismiss the appeal, but we shall impose on the appellant the additional costs of reimbursing both appellees for their expenses in printing the appendices to their briefs. Rule 8–501(m).

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT, INCLUDING THE COSTS OF PRINTING THE APPENDICES TO THE APPELLEES' BRIEFS.**